594 A.2d 1375

**In the Matter of CONDEMNATION BY the URBAN REDEVEL-OPMENT AUTHORITY OF PITTSBURGH of Certain Land in the Twenty–Second and Twenty–Third Wards of the City of Pittsburgh, Allegheny County, Pennsylvania Redevelopment Area No. 39 (North Shore), Being Property of E–V Company, a partnership composed of Emil F. Kehr and Vincent E. Malone, or any other persons found to have an interest in the property, Keller Office Equipment Company, Pittsburgh Harley Davidson, Inc., formerly Allegheny County Distributors, Inc., a Pennsylvania corporation, or any other person found to have an interest in the property.**

**Appeal of E–V COMPANY, a partnership composed of Emil F. Kehr and Vincent E. Malone, or any other persons found to have an interest in the property, and Keller Office Equipment Company.**

Supreme Court of Pennsylvania.

Argued Sept. 24, 1990.

Resubmitted Jan. 21, 1991.

Decided July 12, 1991.

Thomas J. Dempsey, Robert L. Federline, Pittsburgh, Pa., for appellants.

George R. Specter, Pittsburgh, Pa., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

ZAPPALA, Justice.

E–V Company and Keller Office Equipment Company (hereinafter condemnees) filed preliminary objections to a declaration of taking filed on October 9, 1981, by the Urban Redevelopment Authority of Pittsburgh (URA). Allegheny County Common Pleas Court overruled the objections and Commonwealth Court affirmed. 117 Pa.Cmwlth. 475, 544 A.2d 87. We granted their petition for allowance of appeal limited to the questions: 1) "whether the condemnees have been unconstitutionally denied a meaningful hearing at a meaningful time to challenge the certification of blight...." and 2) "whether the taking is invalid for failure of the certification of blight process to comply with the requirements of the Local Agency Law." Put another way, the question before the Court is whether the Local Agency Law, or the Constitution, require a planning commission to notify property owners and hold hearings before determining that an area is appropriate for redevelopment according

to the Urban Redevelopment Law, Act of May 24, 1945, P.L. 991, 35 P.S. § 1701 et seq.

The Urban Redevelopment Law, 35 P.S. § 1702(a), declares as a matter of legislative findings and policy that urban areas may become blighted because of: (1) unsafe, unsanitary, inadequate or over-crowded conditions of the dwellings in the particular area; (2) inadequate planning of the area; (3) excessive land coverage by the buildings in the area; (4) lack of proper light and air and open space; (5) the defective design and arrangement of the buildings in the area; (6) faulty street or lot layout; or (7) land uses in the area which are economically or socially undesirable. It further provides:

(c) That the foregoing conditions are beyond remedy or control by regulatory processes in certain blighted areas, or portions thereof, and cannot be effectively dealt with by private enterprise under existing law without the additional aids herein granted and that such conditions exist chiefly in areas which are so subdivided into small parcels and in divided ownerships that their assembly for purposes of clearance, replanning and redevelopment is difficult and impossible without the effective public power of eminent domain.

35 P.S. § 1702(c). When a planning commission certifies an area as a redevelopment area according to the foregoing standards, the redevelopment authority is empowered to prepare a plan for redeveloping the area for submission to the governing body. If the plan is approved, the authority or its agent may then proceed to implement the plan, including taking of property within the area by eminent domain.

On December 18, 1964, pursuant to a Basic Conditions Report[1], the Planning Commission of the City of Pittsburgh

---

1. A Basic Conditions Report was defined by witness William B. Waddell (community planner with the City of Pittsburgh Planning Department, 1970–80) as "a report on the basic conditions of an area." (R.Rec. 1307a) Mr. Waddell explained that there are three sections to a Basic Conditions Report: First "is the basic conditions as they're recorded in line with a certain format of what the conditions are in an

certified an area containing 203 acres located on the North Side of Pittsburgh as blighted within the meaning of the Urban Redevelopment Law. At that time, the area certified as blighted was called, for project purposes, the "Federal Anderson" area. Included in the "Federal Anderson" area were, among many others, properties located on Isabella Street in the block between the Sixth Street Bridge and Federal Street on the West and the Seventh Street Bridge and Sandusky Street on the East. After the Planning Commission certified the "Federal Anderson" area as blighted, no further action of any kind was taken by the Planning Commission or the URA with respect to the project.

On October 4, 1971, the City Planning Commission met and certified as blighted 90.8 acres located in the North Side of Pittsburgh. Approximately 63 of those acres were part of the 203 acres which previously had been certified as blighted in 1964. The revised 90.8 acres project was referred to as the "North Shore Project" area. Included among the 63 acres that was "recertified" as blighted were the Isabella Street properties between Federal Street and Sandusky Street which had been a part of the area certified as blighted in 1964.

Pursuant to 35 P.S. § 1710(a)–(c), the URA then prepared a redevelopment proposal for the North Shore project area. The proposal showed in detail the proposed method for redevelopment of the area, listed properties to be acquired during the first year of the project, and indicated that rehabilitation was to be a significant part of the redevelopment, mostly as private action with technical assistance provided by the URA. The proposal also provided that "Property will be acquired and cleared to: ... provide developable parcels for redevelopment."

area." Second "is taking these conditions and analyzing them in relation to the seven conditions of blight as defined in the redevelopment law." Third "is ... the recommendation based on that analysis of the redevelopment law." (R.Rec. 1307a)

This redevelopment proposal was submitted to the Pittsburgh City Council, which held a public hearing on the proposal on April 12, 1972. The proposal was approved by City Council on May 5, 1972, and the URA commenced implementing the proposal, over the next several years, acquiring and demolishing properties, applying for federal and state funds, and submitting modifications to the proposal.

The property on Isabella Street owned by the condemnee E–V Company, which is leased by condemnee Keller Office Equipment Company for the operation of its business, was included in the 203 acres certified as blighted in 1964 and in the 90.8 acres certified as blighted in 1971. That Isabella Street property included a four story building known as 32 Isabella Street, an eight story building known as 36 Isabella Street, and a two story building known as 38 Isabella Street. When E–V Company purchased the property in 1977, Keller Office Equipment Company moved from the four story building (32 Isabella Street) to the eight story building (36 Isabella Street). Eventually, in March of 1980 E–V Company sold the four story building. Later, in February, 1981, the two story building was sold. After the condemnee E–V Company had purchased the real estate and buildings in 1977, E–V Company continued to invest money in the property by remodeling the eight story building.

On October 9, 1981, the URA exercised the power of eminent domain and filed a declaration of taking in the Court of Common Pleas of Allegheny County, Pennsylvania, appropriating the properties located on Isabella Street in the North Shore project area, including the property of condemnee E–V Company which property housed the business of condemnee Keller Office Equipment Company at 36 Isabella Street. As stated, preliminary objections were filed. When the case was called for trial, it was ordered to be tried by depositions. In due course various witnesses were subpoenaed and deposed and various documents were produced. Following the taking of depositions, the court filed an Adjudication and Order on February 21, 1986,

denying appellants' preliminary objections. On appeal, the Commonwealth Court concluded that the trial court neither abused its discretion nor committed an error of law and, therefore, affirmed the order overruling the preliminary objections. We granted allowance of appeal, limited to the two questions set out above.

■ Treating the statutory issue first, the appellants argue that the taking of their property by eminent domain is invalid because the process by which the public purpose for the taking was established, the certification of blight, did not conform to the requirements of the Local Agency Law, originally enacted as the Act of December 2, 1968, P.L. 113, 53 P.S. § 11301, effective January 1, 1969, now found at 2 Pa.C.S. §§ 101 and 102, Chapter 5, Subchapter B, and Chapter 7, Subchapter B. That Law provides that "[n]o adjudication of a local agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard." 2 Pa.C.S. § 553. An adjudication is defined as "any final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all parties to the proceeding in which the adjudication is made." 2 Pa.C.S. § 101.

The Commonwealth Court has held that a planning commission's certification of blight is not an adjudication under Section 553 of the Local Agency Law, *Cass Plumbing & Heating Company v. PPG Industries, Inc.*, 52 Pa.Commw. 600, 416 A.2d 1142 (1980). The appellants urge the adoption of the view set out in Judge Blatt's dissenting opinion in *Cass Plumbing*, that the action of certifying an area as blighted must be considered an adjudication because it exposes landowners to eminent domain and other powers of redevelopment authorities, which they would not have been exposed to otherwise.

We are of the view that a certification of blight does not, in and of itself, have a *legal* effect on property rights. It must be emphasized that a certification of blight does not necessarily lead to the taking of all, or even any, of the

property in the certified area by eminent domain. The Urban Redevelopment Law recognizes "[t]hat certain blighted areas, or portions thereof, may require total acquisition, clearance and disposition ... and that other blighted areas, or portions thereof, ... may be susceptible to rehabilitation or conservation or a combination of clearance and disposition and rehabilitation or conservation...." 35 P.S. § 1702(c.1). Among the specific powers given to redevelopment authorities is the power "to initiate preliminary studies of possible redevelopment areas to make and assist in implementing (1) plans for carrying out a program of voluntary repair, rehabilitation and conservation of real property, buildings and improvements, [and] (2) plans for the enforcement of laws, codes and regulations relating to the use of land and the use and occupancy of buildings and improvements...." 35 P.S. § 1709(b). Indeed, the Law has recently been amended to explicitly give redevelopment authorities the power "[t]o make, directly or indirectly, secured or unsecured loans" and "[t]o make loans to or deposits with, ... without requiring collateral security therefor, any financial institution" to finance, among other things, rehabilitation of a redevelopment program. 35 P.S. §§ 1709(aa), (bb), as amended March 30, 1988, P.L. 304, No. 39. Thus, the mere designation of a redevelopment area does not inevitably lead to acquisition by eminent domain.[2]

Of equal significance to our finding that the certification itself does not affect property rights is the fact that the certification merely sets the stage for redevelopment of the area. The redevelopment authority must thereafter devise a plan and submit a detailed proposal to the governing body of the municipality. Only after the governing body has held public hearings and given its approval to the plan can the redevelopment authority take any action that affects

**2.** In fact, the redevelopment proposal in the present case specifically declared that "rehabilitation is a significant part of the proposed redevelopment," and "for the most part, rehabilitation will be carried out as a program of private action." Unfortunately for the appellants, their particular piece of property was not one that could be rehabilitated consistent with the redevelopment program for the area.

property rights in the area. The planning commission's designation of a redevelopment area is thus seen as a preliminary or advisory matter.

The appellants also argue from evidence introduced by way of expert testimony that a certification of blight "affects property rights," and thus is an adjudication, because when it becomes public knowledge that an area has been certified as blighted, deleterious consequences befall landowners and business owners in that area. The testimony was to the effect that real estate, as well as equipment, machinery and fixtures situated are no longer readily saleable on the open market; it is difficult for property owners to obtain mortgages or other loans secured by real estate within the area certified as blighted; business and residential tenants alike have a tendency to move from the area as soon as possible, often before the end of their lease terms, resulting in vacant and boarded-up buildings; and maintenance and repair of the structures within the area are usually neglected by the property owners, further affecting the real estate in a negative way.

Whatever the validity of this evidence, which was not referred to, much less credited, by the court in its findings of fact, it demonstrates only that property *interests may* be affected by subjective reactions to the certification. It does not establish that legal *rights are* affected by the certification itself. Indeed, the experience of the parties to this action belies the claim they advance, for they asserted that following the initial certification of blight in 1964, and again following the 1971 certification, buildings were demolished, there was new construction, properties were bought and sold, and buildings were rehabilitated.[3] Although the appellants attempt to negate this fact by arguing that the expert's assessment applies only where a certification of

---

**3.** If in fact the publicity surrounding a certification of blight has such a drastic effect on the property, and it appears inevitable at that early stage that the property will be condemned, the property owner has resort to the established law of de facto taking to remedy the loss. See *Conroy–Prugh Glass Co. v. Commonwealth*, 456 Pa. 384, 321 A.2d 598 (1974).

blight is *generally known,* this reinforces the conclusion that the deleterious effects flow not from the certification itself but from speculative subjective reactions to it.

■ Our analysis of the appellants' constitutional argument follows a similar course. The appellants rely on *Armstrong v. Manzo,* 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965), as setting out the applicable interpretation of the due process guarantees—that persons may not be deprived of their rights or property without a meaningful opportunity to be heard at a meaningful time, and that proceedings in which the burden of proof has been shifted are inadequate to protect the interests guarded by the due process clauses.[4]

The appellants argue that preliminary objections to a declaration of taking do not offer a meaningful opportunity to be heard at a meaningful time on the propriety of the certification of blight, especially in these circumstances, where nine and a half years passed between the certification and the declaration of taking of their property. They further argue that the ability to file preliminary objections is inadequate to cure the due process deprivation caused by lack of a hearing, since condemnees bear a heavy burden of proving fraud or abuse of discretion by the condemning

**4.** In that case, a step-father and his wife petitioned for the adoption of a child born of the wife and her previous husband. The petitioners alleged that the consent of the natural father was not necessary because he had failed to contribute to the support of the child for more than two years. The previous husband was not notified, and did not have the 'slightest inkling,' of the pending adoption proceedings. After the adoption had been approved, the natural father learned of the action and promptly filed a motion to set aside the adoption decree. The Texas courts recognized that the natural father was entitled to due process, but held that the failure to give him notice and an opportunity to be heard prior to the adoption had been cured by the hearing he received upon his motion to set aside the adoption. The Supreme Court reversed, reasoning that if the natural father had been given the timely notice to which he was entitled, the step-father and his wife (the child's mother), as the moving parties, would have had the burden of proof at any contested proceeding. After a decree of adoption had been entered, the natural father was faced with the affirmative burden of overcoming that adverse decree by one judge based upon a finding of nonsupport made by another judge.

body, which burden, it is suggested, they would not have borne at an earlier hearing. We cannot agree with this argument in either respect.

The appellants suggest that planning commissions must hold public hearings to consider whether to certify an area for redevelopment, and that at such hearings the commission would have the burden of proving that the conditions necessary for invoking the Redevelopment Law existed. Such is clearly not the scheme provided in the Law itself, and the constitutional guarantees of due process cannot be stretched to hold that it is constitutionally required. As detailed above, we view the decision of the commission to designate an area for redevelopment as one that does not itself affect property rights. It is an internal decision made by a government body presumed to perform its duties in good faith and according to law. Planning commissions, like other government agencies, are not required to conduct their decision-making process according to an adversarial model, bearing a burden of "proving" that their proposed actions conforms to the power delegated to them by their enabling legislation.

█ A comparison between the redevelopment process and the process for planning and building a new highway is instructive. The Department of Transportation is authorized to prepare and continually revise a "twelve year program" for construction and improvement of transportation systems. 71 P.S. § 512(a)(13). Depending upon priorities and funding, the proposals included in such program may or may not be undertaken. Once a project has proceeded to the stage where a preliminary plan or design has been submitted that will require the acquisition of new or additional right-of-way, the Department is required to hold public hearings and consider the effects of the project on a host of concerns. 71 P.S. § 512(b)(1)–(23). Statutory newspaper notice of such hearings is sufficient, *In re Condemnation by Commonwealth Department of Transportation of Right of Way for Legislative Route 201, Section 5 R/W*, 22 Pa.Commw. 440, 349 A.2d 819 (1976). The Department

is also required to make written findings that the project will not adversely affect those concerns or that there is no feasible and prudent alternative to such effects. *Id.* Persons aggrieved by any of the Department's findings in this regard may appeal to the Commonwealth Court, 71 P.S. § 512(e), which reviews the actions of the Department under the "abuse of discretion" standard, *Snelling v. Department of Transportation*, 27 Pa.Commw. 276, 366 A.2d 1298 (1976).

Similarly, the Redevelopment Law provides for designation of areas in need of redevelopment as a first step, to be followed by preparation of detailed proposals for redevelopment, 35 P.S. § 1710(a)–(c), submission of the proposals to the planning commission for recommendations, 35 P.S. § 1710(e), and submission of the proposals and planning commission recommendations to the governing body for approval. Before deciding to approve or reject the proposal, the governing body is required to hold public hearings on the redevelopment proposal and give notice of such hearings by newspaper publication, 35 P.S. § 1710(g).

Although the Redevelopment Law does not specifically provide for an appeal for persons aggrieved by a governing body's decision to accept a redevelopment proposal, this Court has held that an action will lie in equity to challenge a certification of blight. In *Crawford v. Redevelopment Authority*, 418 Pa. 549, 211 A.2d 866 (1965), the planning commission had certified a designated area as being in need of redevelopment and had approved a proposal prepared by the redevelopment authority, which, after public hearings, was adopted by the city council and county commissioners. The first issue the Court considered was "the propriety of an attack in equity of a Redevelopment Authority Certification that an area is blighted." *Id.*, 418 Pa. at 553, 211 A.2d at 868. The ready answer was that "[w]e have long held that such an attack is proper when it is alleged and proven that the Authority, in making its certification, acted in bad faith, arbitrarily, or failed to follow a statutory requirement." *Id.*, citing *Oliver v. Clairton*, 374 Pa. 333, 98 A.2d

47 (1953). We emphasized, however, the limited scope of judicial review, stating that an authority's exercise of its discretion should not be disturbed "in the absence of fraud or palpable bad faith." *Id.*

Since a finding of blight is but the first step in a process that could have any number of effects, positive as well as negative, on the area and the individual properties within it, it does no more to "expose property to the powers of eminent domain" (Dissenting Opinion of Larsen, J., at 13) than does a highway department's preliminary plan to locate a highway in a given area.[5] The requirement that the governing body hold public hearings and give notice of those hearings by publication, prior to formal adoption of a proposal for redevelopment, is sufficient to satisfy the due process requirement that those affected have an opportunity to voice their objections. As noted, an action is available in equity for those aggrieved to challenge the certification until declarations of taking have been filed, at which point the same issue may be litigated by way of preliminary objections to the taking. And since those objecting to the certification are required in any case to bear the heavy burden of overcoming the presumption that the authority performed its duties in good faith and according to law, the argument based on *Armstrong v. Manzo*, that preliminary objections to a declaration of taking are an inadequate cure because they shift the burden of proof, must fail. There is no deprivation to cure and the burden does not shift.

Because we find the procedures set out in the Redevelopment Law, the Eminent Domain Code, and the case law adequate under the Due Process Clause and the Local Agency Law to protect property interests at the initial stage of the redevelopment process where an area is certified as a redevelopment area, we affirm the Order of the Commonwealth Court.

5. Indeed, in this sense it may be said that *all* property is "exposed to the power of eminent domain", See Pa. Const. Art. 1, Sec. 10, subject only to the limitation that the government agency exercising that power must not do so arbitrarily or in bad faith.

LARSEN, J., files a dissenting opinion in which PAPADAKOS, J., joins.

FLAHERTY, J., files a dissenting opinion in which PAPADAKOS, J., joins.

LARSEN, Justice, dissenting.

I dissent.

The issues presented in this appeal are: (1) whether the appellants-condemnees, E–V Company and Keller Office Equipment Company, (hereinafter condemnees) have been unconstitutionally denied a meaningful hearing at a meaningful time to challenge the certification of blight which had exposed them to a condemnation proceeding, and (2) whether the taking is invalid for the failure of the certification of blight process to comply with the requirements of the Local Agency Law.

On December 18, 1964, the Planning Commission of the City of Pittsburgh certified an area incorporating 203 acres situated on the North Side of Pittsburgh as a blighted area within the meaning of the Urban Redevelopment Law, Act of May 24, 1945, P.L. 991, 35 P.S. § 1701, et seq. The area certified as a blighted area in 1964 was referred to as the "Federal Anderson" area. Part of the 203 acres known as the "Federal Anderson" area were properties located on Isabella Street in the city block between the Sixth Street Bridge and Federal Street on the West and the Seventh Street Bridge and Sandusky Street on the East. The condemnees' property and business are located in that block.

The record indicates that no notice of the meeting of the Planning Commission that was held on December 18, 1964, was given, by personal service, newspaper advertisements, posting or otherwise, to any of the property owners, residents, tenants, business owners or business operators in the targeted area. On the contrary, the evidence suggests that in 1964, the Planning Commission met regularly at a designated time and generally did not give notice of its meetings. (R.Rec. 684a) Additionally, the record indicates that, in 1964, no hearing was held on the question of whether the

designated area was a blighted area within the meaning of the Urban Redevelopment Law, Act of May 24, 1945, P.L. 991, 35 P.S. § 1701, et seq., and should be certified as such. (R.Rec. 166a & 167a)

After the Planning Commission certified the "Federal Anderson" area as blighted, no further action of any kind was taken by the Planning Commission or the Urban Redevelopment Authority with respect to the project. Subsequent to that certification of blight in 1964, conditions in the "Federal Anderson" area changed in that buildings in the "blighted" area were demolished (R.Rec. 357a & 358a), there was new construction in the "blighted" area (R.Rec. 358a), and there was rehabilitation of existing buildings in the "blighted" area. (R.Rec. 358a). Eventually, by 1971, the Basic Conditions Report of 1964, which led to the certification of blight in December, 1964, became outdated. (R.Rec. 1368a).

Through the years following the 1964 certification of blight, local government maintained an interest in redeveloping at least a part of the "Federal Anderson" area. Acting pursuant to that interest, the City Planning Commission met on October 4, 1971 and certified an area containing 90.8 acres located in the North Side of Pittsburgh as a blighted area. Approximately 63 of those 90.8 acres had been part of the 203 acres previously certified as blighted in 1964. The revised 90.8 acres redevelopment project was called the "North Shore Project" area. Again, there is no record of any notice having been given, by personal service, newspaper advertisement, posting or otherwise, to any property owners, residents, tenants, business owners or business operators when the "North Shore Project" area was certified (part of which was "recertified") as blighted.

The property on Isabella Street which is leased by condemnee Keller Office Equipment Company for the operation of its business and which property is owned by the condemnee E–V Company, was included in the 90.8 acres certified as blighted in 1971 as well as in the 203 acres

certified as blighted in 1964.[1]  That Isabella Street property included a four story building known as 32 Isabella Street, an eight story building known as 36 Isabella Street, and a two story building known as 38 Isabella Street.  When E–V Company purchased the property in 1977, Keller Office Equipment Company moved from the four story building (32 Isabella Street) to the eight story building (36 Isabella Street).  Subsequently, condemnee E–V Company sold the four story building (32 Isabella Street) in March of 1980. The two story building (38 Isabella Street) was sold in February of 1981.

At the time condemnee E–V Company purchased the property in 1977, a title search was made and that search did not disclose the fact that the property was in a certified blighted area.  Likewise, in 1980 and in 1981 when E–V Company subdivided the property and sold two of the buildings it had acquired in 1977 (32 Isabella Street and 38 Isabella Street), title searches were done in connection with each of those transfers.  Neither of those title searches disclosed that the property and buildings being sold and transferred by E–V Company were located in an area certified as blighted.  Additionally, when the sales in 1980 and 1981 were made, Condemnee, E–V Company, was required to submit a plan of subdivision to the appropriate local authorities which plan was officially approved without notice that the property was in an area certified as blighted.

After the condemnee E–V Company had purchased the real estate and buildings in 1977, E–V Company continued to invest money in the property by remodeling the eight story building.  In connection with that remodeling work, it was necessary for the condemnee to obtain permits from the City of Pittsburgh in order to lawfully proceed with its

1.  Keller Office Equipment Company, a business corporation having two shareholders, Emil F. Kehr and Vincent E. Malone, purchased the office supply business in 1973 from the previous owner, Fred Keller. The business had been operated at the same Isabella Street location since at least 1965.  (R.Rec. 706a).  E–V Company, a partnership composed of Messers. Kehr and Malone, purchased the Isabella Street Property in 1977 from Lewis Enterprises, the previous landlord from whom Keller had leased its space.

plans. R.Rec. 727a). Those permits were obtained without notice that the building the condemnee, E–V Company, was remodeling was located in an area which was certified as blighted.

There was testimony that since the original certification of blight in 1964, several new businesses had located in the "blighted" area and many of the buildings therein were renovated and remodeled. (R.Rec. 758a–769a & 921a–938a, Exhibit 45 & Exhibit 53)  For example, in 1975, Pittsburgh Harley–Davidson, Inc. (Pittsburgh Harley), a condemnee in the lower court proceedings but not an appellant here, applied for and received permission from the Pittsburgh Board of Adjustment to erect an addition to its existing building on Isabella Street (in the block between Federal Street and Sandusky Street) which, unbeknownst to Pittsburgh Harley, was in the "North Shore Project" redevelopment area.  Pursuant to the permission received from the Board of Adjustment, Pittsburgh Harley obtained all of the necessary permits from the City of Pittsburgh and proceeded to erect the addition.  All of this was accomplished without notice to Pittsburgh Harley that its property was in an area which had been certified as blighted.

In short, there was no notice given of the meeting of December 18, 1964, when the original 203 acres was certified as blighted.  Following that 1964 meeting, there was no notice given to anyone affected by the certification that the designated area had been certified as blighted.  Similarly, there was no notice given of the meeting of October 4, 1971, when the 90.8 acres of the North Shore Project was certified as blighted.  Again, following that meeting, there was no notice given to anyone affected by the certification that the "North Shore Project" area, wherein the appellants' property and business are located, was certified or recertified as blighted.  Further, neither the certification of blight made in 1964 nor the certification of blight made in 1971 was recorded in the Recorder's Office of Allegheny County where it would have served as notice and could have been discovered in a title search.  The condemnees and/or

their predecessors did not have the slightest inkling that their property and business was in an area certified as blighted and thus exposed to the powers of eminent domain.

On October 9, 1981, the Urban Redevelopment Authority of Pittsburgh exercised the power of eminent domain and filed a declaration of taking in the Court of Common Pleas of Allegheny County, Pennsylvania. That declaration of taking pertained to the "North Shore Project" area and included the property at 36 Isabella Street owned by condemnee E–V Company, and leased by condemnee Keller Office Equipment Company for the operation of its office supply business. The condemnees filed preliminary objections to the declaration of taking and the case was assigned to the Honorable Maurice Louik for adjudication. Judge Louik filed an Adjudication and Order on February 21, 1986, in which he denied appellants' preliminary objections. Judge Louik characterized this case as a struggle of a small business to maintain its property in the face of the governmental exercise of eminent domain. He stated that upon the record there is a "clear appearance of inequality of treatment" with respect to the condemnees in this case. Judge Louik went on to say:

"If left to our own discretion, we would sustain condemnees' preliminary objections, but under the standard enunciated by the Commonwealth Court, we cannot substitute our discretion for that of the Authority." (Louik, J., Adjudication and Order, February 21, 1986, p. 13)[2]

## I.

First, the condemnees argue that the declaration of taking filed on October 9, 1981, based upon a certification of

---

**2.** The Commonwealth Court standard referred to and followed by the trial judge is set forth in *Matter of Condemnation by Urban Redevelopment Authority of Pittsburgh,* 92 Pa Commw. 602, 499 A.2d 1146 (1985), where the Commonwealth Court reiterated that absent proof that a certification of blight was arbitrary, capricious, made in bad faith or the product of an abuse of discretion, that the trial judge may not substitute his discretion for that of the agency regarding the conditions of blight.

blight in 1971 which was, in part, a "recertification" of blight originally made in 1964, is void and of no legal effect. The condemnees base their argument on the failure of the Planning Commission to provide a "due process hearing" with respect to the certification of blight in 1964 and the "recertification" of blight in 1971.

The condemnees point out in their brief that the Urban Redevelopment Law, Act of May 24, 1945, P.L. 991, 35 P.S. § 1701, et seq., does not specifically provide for notice and a hearing regarding a certification of blight. Furthermore, neither the Second Class City Code, Act of March 7, 1901, P.L. 20, as amended, 53 P.S. § 22101, et seq., nor the Municipalities Planning Code, Act of July 31, 1968, P.L. 805, as amended, 53 P.S. § 10101, et seq., specifically require notice and a hearing with respect to a certification of blight in delineating the powers and responsibilities of planning commissions. Nonetheless, the legislature's failure to make provision for notice and a hearing in those statutes does not negate the condemnees' right to due process. That right is guaranteed by the Constitutions of the United States and of Pennsylvania.

The Fifth Amendment of the United States Constitution provides:

> No person shall be ... deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use, without just compensation.

Article 1, § 10 of the Pennsylvania Constitution provides:

> [P]rivate property [shall not] be taken or applied to public use, without authority of law and without just compensation being first made or secured.

"The power of eminent domain, next to that of conscription of man power for war, is the most awesome grant of power under the law of the land." *Winger v. Aires*, 371 Pa. 242, 244, 89 A.2d 521, 522 (1952) It may never be exercised to appropriate private property except for public use. Almost 150 years ago this court said:

The right of eminent domain does not authorize the government to take the property of the citizen for the mere purpose of transferring it to another, even for a full compensation, when the public is not interested in the transfer. Such an arbitrary exercise of power would be an infringement of the constitution, as not being within the power delegated by the people to the legislature. *Pittsburgh v. Scott*, 1 Pa. 309, 314 (1845) Uses which are public uses sufficient to permit the exercise of eminent domain are to be determined by the legislature, subject to correction or restriction where it clearly appears that the right is abused. *Id.* at p. 314.

The legislature has enacted the Urban Redevelopment Law, 35 P.S. § 1702(a) which declares as a matter of legislative findings and policy that urban areas become *blighted* because of: (1) unsafe, unsanitary, inadequate or overcrowded conditions of the dwellings in the particular area; (2) inadequate planning of the area; (3) excessive land coverage by the buildings in the area; (4) lack of proper light and air and open space; (5) the defective design and arrangement of the buildings in the area; (6) faulty street or lot layout; or (7) land uses in the area which are economically or socially undesirable. The Urban Redevelopment Law further provides, inter alia, as follows:

(b) That such conditions or a combination of some or all of them have and will continue to result in making such areas economic or social liabilities, harmful to the social and economic well-being of the entire communities in which they exist, depreciating values therein, reducing tax revenue, and thereby depreciating further the general community-wide values. (35 P.S. § 1702(b))

(c) That the foregoing conditions are beyond remedy or control by regulatory processes in certain blighted areas, or portions thereof, and cannot be effectively dealt with by private enterprise under existing law without the additional aids herein granted and that such conditions exist chiefly in areas which are so subdivided into small parcels and in divided ownerships that their assembly for

purposes of clearance, replanning and redevelopment is difficult and impossible without the effective public power of eminent domain. (35 P.S. § 1702(c))

(c.1) That certain blighted areas, or portions thereof, may require total acquisition, clearance and disposition, subject to continuing controls as provided in this act, since the prevailing condition of decay may make impracticable the reclamation of the area by rehabilitation or conservation, and that other blighted areas, or portion thereof, through the means provided in this act, may be susceptible to rehabilitation or conservation or a combination of clearance and disposition and rehabilitation or conservation in such a manner that the conditions and evils hereinbefore enumerated may be eliminated or remedied. (35 P.S. § 1702(c.1))

(d) That the replanning and redevelopment of such areas are in accordance with sound and approved plans for their redevelopment will promote the public health, safety, convenience and welfare. (35 P.S. § 1702(d))

The legislature, in enacting the Urban Redevelopment Law, has declared that the clearance and redevelopment of a blighted area is a public use which justifies the exercise of the power of eminent domain and the expenditure of public monies. The key to the lawful exercise of eminent domain in an area designated for redevelopment is that the area is blighted as defined by the Urban Redevelopment Law. Once there is an official certification that an area is blighted, the way is clear for the exercise of eminent domain to acquire the properties within the certified area. The properties may then be transferred to a private redeveloper [3] who proceeds to redevelop the area under a contract with the Authority. Property owners in the redevelopment area

3. The Urban Redevelopment Law defines "Redeveloper" as:
Any individual, government, partnership or public or private corporation that shall enter or propose to enter into a contract with an Authority for the redevelopment of an area, or any portion thereof, or any building or structure thereon, under the provisions of this act.
35 P.S. § 1703(*l*).

are exposed to the involuntary loss of their property. Likewise, business owners who operate their businesses in the area stand to lose their businesses. These drastic consequences are made possible by an official certification that the neighborhood is in a blighted area notwithstanding the actual physical condition of the various properties.

John P. Robin, who served as the first Director of the Urban Redevelopment Authority of Pittsburgh from 1948 to 1955 and who, at the time of his testimony had been again serving as the Authority's Chairman since 1977, testified that when he became Chairman of the Redevelopment Authority for the second time, the "North Shore Project" was a high priority. (R.Rec. 1133a–1134a) Mr. Robin and his colleagues called upon various companies to seek advice and to develop interest in the proposed redevelopment project. The Authority discovered that the Mellon–Stuart organization, a company involved in real estate development and construction, had an interest in the redevelopment area. The North Shore area, because of its convenient location, was an attractive location. (R.Rec. 1135a) Mellon–Stuart indicated a desire to relocate its home office to that area. Eventually Mellon–Stuart was selected as the redeveloper. (R.Rec. 1135a–1136a)

Mr. Robin testified that the properties on Isabella Street had become the subject of the redevelopment proposal because those who had studied the area concluded that the blocks between the Sixth Street, Seventh Street and Ninth Street bridges spanning the Allegheny River between Pittsburgh's Golden Triangle and the North Side was the appropriate place to begin redevelopment of the North Shore area. (R.Rec. 1136a) Mr. Robin testified that:

> [The blocks of Isabella Street] were the ones that are most immediately adjacent to the built-up portion of the Golden Triangle and are part of the visibility and easily exchanged with the Triangle itself.
>
> Secondly, because they are compact blocks which each one (sic) can be handled as a unit. Third, because their acquisition was within the probable range of the Authori-

ty's financial capacity. But primarily because they were *opportunity blocks* in the area. (emphasis added).

(R.Rec. 1136a) Mr. Robin defined an "opportunity block" as:

[A block] where you can have a chance of finding a developer. There's no point in proclaiming an entire city a redevelopment area and leaving it up to chance. You try to find specific redevelopment project points with the redevelopment area having defined that. So these blocks, in particular, this block between these two bridges, became the best opportunity for development.

(R.Rec. 1136a–1137a).

According to the witness Mr. Robin, the Pittsburgh Redevelopment Authority operated on the principle that once an area has been certified as blighted within the meaning of the Urban Redevelopment Law, the properties within that certified blighted area may be condemned and taken at any time up until the project has been certified as completed by the redeveloper and the Authority. (R.Rec. 142a). This means that the properties within the redevelopment area remain exposed to the powers of eminent domain until the redeveloper and the Authority say the project is complete.

The evidence indicated that the condemnees' property on Isabella Street was coveted by the redeveloper Mellon–Stuart. It appears that Mellon–Stuart desired to acquire the condemnees' property and erect a building thereon which would blend in with the planned construction of other buildings on adjacent tracts and become a part of its new headquarters. Interestingly, buildings nearby and similar to the building of the condemnee E–V Company, one as close as fifty feet away, were not taken by the Authority. These neighboring buildings, comparable to condemnee's building, were privately rehabilitated by their owners. (See Findings of Fact No. 33, Adjudication, Louik, J., February 21, 1986) Apparently, the buildings in which private rehabilitation by the owners was permitted were not the objects of the redeveloper's desires and plans. Thus, those proper-

ties escaped condemnation and taking solely because of the private interests of the redeveloper.

Beginning in 1964 when, without notice, the condemnee E–V Company's property on Isabella Street was part of the "Federal Anderson" area certified as blighted, and continuing in 1971 when, without notice, that same property was a part of the area recertified as blighted in the "North Shore Project", E–V Company's property was encumbered by that certification of blight. It was encumbered to the extent that it was exposed to the risk that, regardless of how well it was maintained or how it was improved, it could be condemned and taken under the power of eminent domain and turned over to a redeveloper for that redeveloper's private use.

The condemnees argue that the procedure used by the Redevelopment Authority in certifying and recertifying as blighted the area now known as the "North Shore Project" area was defective and thus, caused all steps later taken by the Authority to be void. The condemnees argue that they and/or their predecessors should have been afforded a "due process hearing" at the time when the Authority decided to certify the "Federal Anderson" area and then later the "North Shore Project" area as blighted. In advancing their argument the condemnees rely upon the requirements of due process enunciated by the U.S. Supreme Court in its opinion in *Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). In *Armstrong v. Manzo, supra*, the Court said:

A fundamental requirement of due process is 'the opportunity to be heard.' *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783 [58 L.Ed. 1363 (1914)]. It is an opportunity which must be granted at a meaningful time and in a meaningful manner.

380 U.S. at 552, 85 S.Ct. at 1191. The condemnees argue that under *Armstrong v. Manzo, supra*, they and/or their predecessors were entitled to a meaningful hearing at a meaningful time on the question of whether the area in which their property and business are located was a blight-

ed area within the meaning of the Urban Redevelopment Law. The appellee, Urban Redevelopment Authority of Pittsburgh, argues that the condemnees were afforded a meaningful hearing under the provisions of the Eminent Domain Code, 26 P.S. § 1–406 which provides that the condemnee may file preliminary objections to the declaration of taking.

Preliminary objections shall be limited to and shall be the exclusive method of challenging (1) the power or right of the condemnor to appropriate the condemned property unless the same has been previously adjudicated; (2) the sufficiency of the security; (3) any other procedure followed by the condemnor; or (4) the declaration of taking. . . .

26 P.S. § 1–406(a). The Authority's position is that the hearing the condemnees had on the preliminary objections they filed in this case in 1981, and which objections were finally adjudicated in 1986, was a meaningful hearing at a meaningful time and satisfies the requirements of due process. I disagree.

It is clear that the elements of due process are notice and an opportunity to be heard. *Armstrong v. Manzo, supra, Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), *Martin v. Department of Environmental Resources,* 120 Pa.Commw. 269, 548 A.2d 675 (1988). It equally clear (and undisputed) that the condemnees and/or their predecessors did not receive notice (by personal service, advertisements, posting or otherwise) of the planning commission's intent to certify the "Federal Anderson" area in 1964 and then the "North Shore Project" area in 1971 as blighted. Additionally, it is equally clear (and undisputed) that the condemnees and/or their predecessors were not afforded an opportunity to be heard in 1964 nor in 1971 on the question of the certification of blight which directly and substantially affected their property. I would hold, therefore, that the condemnees and/or their predecessors were denied a meaningful hearing at a meaningful time to challenge the certification of blight which affected their proper-

ty and property rights and exposed their property to condemnation.

The hearing granted to condemnees on their preliminary objections to the declaration of taking under 406(a) of the Eminent Domain Code fails to satisfy the requirements of due process.[4] Judicial review on the condemnees' preliminary objections is limited to proof by the condemnees that the certification and/or recertification of blight was arbitrary and capricious and/or constituted fraud or an abuse of discretion on the part of the redevelopment authority. *Simco Stores v. Redevelopment Authority of Philadelphia*, 455 Pa. 438, 317 A.2d 610 (1974). The condemnees' burden in this regard is a heavy one indeed. *Id.*

If the condemnees and/or their predecessors had been given notice and an opportunity to be heard on the condition of blight in 1964 and again in 1971 when the question of blight was before the planning commission for certification, the commission, being the moving party, would have properly had the burden to establish that one or more of the conditions of blight, as defined by the Urban Redevelopment law, then and there existed. Additionally, the commission, as the moving party, would have properly had the burden of establishing that such conditions or a combination of some or all of those conditions had the effect of making

---

**4.** Our sister states New Jersey and New York both provide for public notice and hearing when a local government targets an area for redevelopment.

    The New Jersey Blighted Area Act, N.J.S.A. 40:55–21.4 provides:

        The governing body or the planning board shall thereupon cause a hearing to be held at an appointed time and place for the purpose of hearing persons interested in, or who would be affected by, a determination that the area is a blighted area, as defined in this act, and who favor or who are against such a determination.

    Section 40:55–21–5 provides for public notice of such hearing setting forth, inter alia, the boundaries of the area to be considered for a certification of blight.

    The New York Urban Redevelopment Corporations Act, 41 C.L.S. Private Housing Finance Law § 203(3) provides: "A planning commission may approve a development plan after a public hearing ..." § 203(3)(g) sets forth the requirements of the notice of the public hearing to be held by the planning commission prior to approval of any development plan.

the targeted area a social or economic liability, resulting in depreciated property values and reduced tax revenues; and such conditions were beyond the remedy and control of regulatory processes; and such conditions could not be effectively dealt with by private enterprises. 35 P.S. §§ 1702(b), 1702(c), 1702(c.1) and 1702(d), supra. Further, the commission, as the moving party, would have properly had the burden to prove that the condemnees' property and business were reasonably part of the area in which one or more of the statutory conditions of blight applied. The commission's witnesses could have been cross-examined and its evidence could have been thoroughly reviewed by the condemnees and their counsel. The condemnees could then rest on their cross examination of the commission's witnesses or introduce evidence of their own to contradict the assertions of the commission in opposing the proposed certification of blight, particularly as it affected condemnees' immediate neighborhood and property. The condemnees and/or their predecessors, whose property and property rights would be affected by the commission's planned certification of blight, properly could prevail without being required to *affirmatively* prove anything. This is contrasted with the heavy burden which *Simco Stores* places on the condemnees in contesting the certification of blight, after the fact, by preliminary objections to the declaration of taking.[5] This burden is often made more weighty by a long delay between the certification of blight and the declaration of taking as was the case here. The condemnees were faced with the distinct burden of proving that the certification of blight made in 1971 which, in material part, was a recertification of the certification of blight made in 1964, was arbitrary, capricious, fraudulent or an abuse of discretion. During such a lapse of time, conditions change, witnesses, for many reasons, become unavailable, evidence is lost and memories fade. Under

5. If there is to be a heavy burden, it should fall upon the governmental agency which proposes to take private property from one citizen and turn that property over to another citizen known as a redeveloper, for the redeveloper's private use.

*Simco Stores,* if the condemnees are unable to prove that the certification was arbitrary, capricious, fraudulent or an abuse of discretion, then the condemnation stands and the condemnees' property may be taken even though the commission may not have been able to establish any of the statutory conditions of blight at the time of the certification. Such a hearing is not a meaningful hearing at a meaningful time and thus fails to satisfy the requirements of due process.

## II.

Next, the condemnees argue that the condemnation and taking is invalid in that they were not afforded a hearing concerning the certification of blight as required under the provisions of the Local Agency Law, 2 Pa.C.S.A. § 101 et seq.[6] Section 553 of the Local Agency Law provides:

No adjudication of a local agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard....

Act of 1978, April 28, P.L. 202, No. 53, § 5, 2 Pa.C.S.A. § 553 (Substantial reenactment of act of December 2, 1968 (P.L. 1133, No. 353), § 4 (53 P.S. § 11304)) The question, thus, is whether the certifications of blight made by the planning commission in 1964 and again in 1971 constituted adjudications of a local agency.

"Local Agency" is defined by the Local Agency Law in § 101 as: "A government agency other than a Commonwealth agency." "Government Agency" is defined in § 101 as: "Any Commonwealth agency or any political subdivision or municipal or other local authority, or any officer or agency of such political subdivision or local authority."

6. As I noted above, the Urban Redevelopment Law, 35 P.S. § 1701, et seq., fails to provide a procedure whereby the property owners in a neighborhood which the local government proposes to certify as blighted may be given notice and an opportunity to be heard. The Local Agency Law, 2 Pa.C.S.A. § 551, et seq., was enacted to fill such a void and provide a forum and procedure where none otherwise exists. See *Boehm v. Board of Education of Pittsburgh,* 30 Pa.Commw. 468, 373 A.2d 1372 (1977).

The Planning Commission of the City of Pittsburgh is an agency of a local authority—the Urban Redevelopment Authority. As such, it is a "local agency" within the meaning of the Local Agency Law. Thus, any adjudication of the Pittsburgh Planning Commission is subject to the provisions of the Local Agency Law.

"Adjudication" is defined by the Local Agency Law in § 101 as:

Any final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceedings in which the adjudication is made. The term does not include any order based upon a proceeding before a court or which involves the seizure or forfeiture of property, paroles, pardons or releases from mental institutions.

The certifications of blight made by the planning commission with respect to the "Federal Anderson" area in 1964 and the "North Shore Project" area in 1971 were broad determinations or rulings by the commission affecting the property rights, privileges and immunities of the condemnees and/or their predecessors.

The extensive powers of the Redevelopment Authority to condemn large areas of land, including those tracts of land which are safe, sanitary and prosperous but which happen to be within an otherwise blighted area, is entirely contingent on the Planning Commission's certification of the area as blighted. Section 9(i) of the Urban Redevelopment Law, 35 P.S. § 1709(i). Because the landowners [and business owners] here would not have been exposed to the powers of the Redevelopment Authority but for the certification of blight, I believe that the certification constitutes a determination or ruling by an agency affecting the *property rights* or the *immunities* of the landowners [and business owners], and must therefore fall within the definition of an 'adjudication' under the Local Agency Law. 2 Pa.C.S.A. § 101.

*Cass Plumbing & Heating Co. v. PPG Industries,* 52 Commw. 600, 416 A.2d 1142, 1149 (1980) (Blatt, J. Dissenting).

When the public learns that an area has been certified as blighted, deleterious consequences befall landowners and business owners in that area. There was testimony by condemnees' real estate expert that real estate, as well as equipment, machinery and fixtures situated in a certified blighted area, are no longer readily saleable on the open market; and it is difficult for property owners to obtain mortgages or other loans secured by real estate within the area certified as blighted. Further, business tenants and residential tenants alike have a tendency to move from the certified blighted area as soon as possible, often before the end of their lease terms resulting in vacant and boarded-up buildings. Maintenance and repair of the structures within the area are usually neglected by the property owners, further affecting the real estate in a negative way. (R.Rec. 1034a–1035a). These are some of the effects on the property rights, privileges and immunities of property and business owners in an area certified as a blighted area.

The majority minimizes the effect a certification of blight has upon the property and business owners in the area certified. The majority concludes that even though a certification of blight may: (a) depress the marketability of the real estate and the equipment, machinery and fixtures located therein; (b) render it difficult to obtain financing of any kind that is secured by real estate in the certified area; (c) motivates tenants to flee the area, often before leases have expired, resulting in vacant and boarded-up buildings; and (d) result in property owners neglecting maintenance and repair of their buildings further depressing property values, these injurious conditions, nonetheless, do not establish that legal rights are affected by the certification itself.[7]

7. The majority observes that the deleterious effects which the appellants' expert testified was caused by a certification of blight applies only where such a certification is generally known. This, the majority says "reinforces the conclusion that the deleterious effects flow not from the certification itself but from speculative subjective reactions

The majority ignores the obvious. Prior to the certification of blight in 1964 ("Federal Anderson Area") and recertification of blight in 1971 ("North Shore Project Area"), the property within the respective project areas could not be condemned and taken by local government and then transferred to a private redeveloper for that redeveloper's private use. After the certification of blight in 1964 and the recertification in 1971, the property within the area certified as blighted was now lawfully exposed to condemnation and taking for redevelopment and use by a private redeveloper. As the majority points out, among the powers given to redevelopment authorities is the power to make and implement plans for a program of voluntary repair and rehabilitation of the real estate and buildings within the certified area. This results in allowing the private redeveloper to pick and choose the locations within the certified area the redeveloper wishes to redevelop and/or use for the redeveloper's own private purposes. In this case the private redeveloper, Mellon–Stuart, chose to relocate its own business offices to the property owned by appellant E–V Company and occupied by appellant Keller Office Equipment Company. There is no question that a certification of blight is a decision, determination or ruling affecting property rights, privileges and immunities and thus is an adjudication within the meaning of the Local Agency Law.

Judge Blatt observed in her dissent in *Cass Plumbing & Heating Co. v. PPG Industries, Inc.,* supra:

[T]he entire scheme for the certification of an area as blighted is weighted against the landowners [and business owners] in favor of the condemnor, leaving the Redevelopment Authority 'with unbounded, unfettered and limitless discretionary power to appropriate and con-

to it." (Slip Opinion, p. 9) The majority's observation neglects to take into account that notification to the property and business owners in the targeted area along with a hearing on the question of blight may very well result in the government failing to prove blight. Further, due process must not be sacrificed on the altar of secrecy so that reactions to a certification of blight by the citizenry may be avoided.

demn as dilapidated ... *as large an area as they believe can be made more prosperous.'* (citation omitted)

*Id.*, 52 Commw. at p. 60, 416 A.2d at p. 1150. A property owner who owns sound and well maintained property in a flourishing neighborhood may become exposed to condemnation for the purposes of redevelopment merely because his property is located in an "opportunity block" as defined in the testimony of John P. Robin cited *supra*. These kinds of blocks are included in a certification of blight regardless of how well maintained they may be and notwithstanding that the statutory criteria of blight does not apply to them standing alone. Mr. Robin testified that "opportunity blocks" are made part of a redevelopment package area as an inducement to attract redevelopers. (See testimony of John P. Robin, R.Rec. 1136a–1137a).

We are treading on dangerous ground when we permit, in this country, one party to take another's property merely because that party "just wants to have it." "A man's home and property used to be his castle." *Cass Plumbing & Heating Co. v. PPG Industries, Inc.*, 488 Pa. 564, 565, 412 A.2d 1376, 1377 (1980) (Dissenting Opinion, Larsen, J., joined by Flaherty, J.). When the government wishes to commence a procedure which ultimately leads to dispossessing a property owner of his "castle", the government's action must meet the requirements of due process by giving such property owner timely notice and a meaningful opportunity to be heard.[8] I thus would hold that the condemna-

8. Timely notice and an opportunity to be heard are mandated by the Historic Preservation Act, 1988, May 26, P.L. 414, No. 72, 37 Pa.C.S.A. § 501 et seq., where the government proposes to designate private property for inclusion on the Pennsylvania Register of Historic Places. Section 503 of that Act provides:

The owner of private property of historic, architectural or archaeological significance, or a majority of the owners of private properties within a proposed historic district, shall be given the opportunity to concur in, or object to, the nomination of the property or proposed district for inclusion on the Pennsylvania Register of Historic Places. If the owner of the property, or a majority of the owners of the properties within the proposed historic district, object to the inclusion, the property shall not be included on the register.

tion and taking of condemnees' property and business in this case is a nullity for failure of the government to afford the condemnees reasonable notice and an opportunity to be heard in accordance with the Local Agency Law.

I would reverse the order of the Commonwealth Court.

PAPADAKOS, J., joins in this dissenting opinion.

FLAHERTY, Justice, dissenting.

The majority sanctions the wielding of unchecked governmental power over the rights of property owners for a purpose not traditionally governmental, i.e. taking from one to give to another. At the least minimal due process would require the opportunity for one whose property is to be placed in jeopardy to be heard on the issue of blight which will conclusively determine whether a prospective taking is for a governmental purpose sufficient to invoke the power of eminent domain. I sense the majority is adopting an "end justifies the means" approach and I view it as a dangerous precedent. I dissent.

PAPADAKOS, J., joins in this dissenting opinion.