Pittsburgh Urban Redevelopment Authority *v.* Cleban et ux., Appellants.

Argued November 10, 1969.  Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Leonard M. Mendelson,* with him *William S. Hays,* for appellants.

*Richard W. Kelly,* with him *William G. Sutter,* for appellee.

OPINION BY CERCONE, J., March 19, 1970:

A Case Stated in Assumpsit was filed in the County Court of Allegheny County (now Common Pleas) to determine whether or not the Urban Redevelopment Authority was entitled to collect rent from Martin Cleban and Ray Cleban, his wife, trading as Blue Ribbon Fruit Market, for the use and occupancy after condemnation of premises located at 6201 Penn Avenue, Pittsburgh, Pennsylvania, from July 16, 1966 until May 17, 1967. In an amendment to the Case Stated the parties agreed that $162.50 was a fair monthly value if rent was found due and owing.  The matter was placed on the Argument List and presented to the court en banc upon oral argument and briefs.  After deliberation the court entered judgment for the Authority and against the Clebans in the amount of $1,625.00.  The Clebans

have appealed to this court contending that the order against them for the payment of rent is without authority of law. The facts agreed to between the parties are as follows:

On September 10, 1965 the Authority condemned the property located at 6201 Penn Avenue, Pittsburgh, as part of its East Liberty Urban Redevelopment Project. At that time, the Clebans were tenants of the property under a month-to-month lease at a rental of $325.00 monthly. A copy of the Declaration of Taking was duly served on Clebans on September 17, 1965. On March 17, 1966 the Authority sent the Clebans the following letter, attached as an Exhibit to the Case Stated:

"Dear Mr. Cleban:

The Urban Redevelopment Authority of Pittsburgh Condemned the property above captioned which you are now occupying on September 15, 1965[1] by a Declaration of Taking filed in the Court of Common Pleas of Allegheny County, Pennsylvania, at No. 3000 October Term, 1965. *This letter is sent to you, as required by law, so that the Authority may perfect its right to possession of this property.*[2]

*In order to complete the legal steps necessary for the condemnation of the above property the Urban Redevelopment Authority of Pittsburgh hereby offers to pay you $1.00 for the taking and appropriation of the property. You are entitled to reasonable relocation expenses and, if qualified, dislocation damages. To determine the amount of those damages we urge that you discuss the matter with our staff at the East Liberty Field Office, 5814 Penn Avenue.*[2]

If the property is not immediately needed by the Authority and you should desire to remain in posses-

---

[1] Correct date: September 10, 1965.

[2] Emphasis supplied.

sion until it is needed, a representative of this office will contact you *to arrange for the payment of your rent*[3] and to discuss other terms concerning your occupancy of the premises. *Otherwise, you are advised to proceed with your relocation immediately.*[3]

Upon receipt of this letter, you are requested to contact Mr. Daniel Pietragallo, Manager of the East Liberty Field Office. The phone number is 441-7210.

> Very truly yours,
> Robert B. Pease
> Robert B. Pease
> Executive Director

RBP :RWK :rs
Hand Carried March 17, 1966"

The Clebans, however, refused to offer to vacate or deliver possession of the premises or to tender payment of rent from July 16, 1966 until May 17, 1967 when they vacated the premises.

Section 407(a) of the Eminent Domain Code[4] (Act of June 22, 1964, P. L. 84, 26 P.S. 1-407(a)) states that "(a) The condemnor after filing the declaration of taking, shall be entitled to possession or right of entry upon payment of, *or a written offer to pay* to the condemnee, the amount of just compensation as *estimated by the condemnor. . .*" The question before us is whether or not the Authority's letter of March 17, 1966 constitutes "a written offer to pay to the condemnee, the amount of just compensation as estimated by the condemnor" so as to entitle the Authority to possession of the condemned premises. The Clebans say that the Authority should have offered them a specific amount for relocation expenses and dislocation damages and should not merely have offered to discuss the

---

[3] Emphasis supplied.

[4] Hereinafter referred to as "the Code."

amount.[5] The Authority, on the other hand, contends that it made as complete an offer as it could under the circumstances; that no specific sum could or should have been offered until it received from the Clebans the requested information which was within the Clebans' peculiar knowledge and control. A similar argument was made in *Washington Square Urban Renewal Area Condemnation,* 40 Pa. D. & C. 2d 345 (1966), and the Common Pleas Court of Philadelphia there reasoned: "The Court agrees with the Authority. Sections 1-407 (a) and (b) of the Eminent Domain Code do require the authority to pay to the condemnee the authority's good faith estimate of damages inflicted by condemnation. However, where relocation or moving expenses are involved, the authority has no means of ascertaining an approximate cost figure. Such a figure would depend on the type of objects moved, the distance these objects were moved and collateral problems that are strictly within the knowledge of the condemnee. Since the condemnee in this case has failed to supply the authority with receipts of any bills paid in the process of relocation, the authority should be under no duty to file an estimate of just compensation which would, in reality be merely speculation and not an estimate."

The tenants ask us to disregard this lower court decision, saying that its holding is incorrect or at least is distinguishable from the present case. They contend that in the *Washington* case only relocation expenses were involved; whereas, in the present case both relocation expenses and dislocation damages are at issue. They argue that since such dislocation damages are computed by use of a mechanical formula provided in section 609 of the Code, the Authority should have of-

[5] There is no controversy as to the $1.00 consideration for the taking and appropriation of the property, it being admitted by the Clebans at the viewers' hearing held prior to March 17, 1967 that they had no leasehold claim against the Authority.

fered a specific sum as computed by that mechanical formula, and having failed to do so in their letter of March 17, 1966 it failed to offer to pay to the Clebans an amount so as to entitle it to possession of the condemned premises. However, a reading of that section 609 clearly reveals that such dislocation damages are payable "only where it is shown that the business cannot be relocated without substantial loss of patronage." In its comment to section 609, the Joint State Government Commission which drafted the Code, states: "Under it (Section 609) the initial burden is on the claimant to show that the business is of such a local character that it cannot be relocated without substantial loss of patronage. Generally this would be true only of the small neighborhood business. If this burden is sustained *then*[6] the section provides a mechanical formula for fixing the amount of compensation for this loss."

The burden was thus on the Clebans to first prove they were entitled to business dislocation damages. The Authority was not required either to assume that the Clebans were entitled to dislocation damages or to make an investigation to determine whether they were entitled to such damages. The Authority was only required to offer to pay such dislocation damages if the Clebans qualified, and it did make this offer in its letter.

As to an offer of a specific amount of reasonable relocation expenses, we would agree with the reasoning of the lower court in the *Washington Square Urban Renewal* case, supra, that until the Authority receives from the condemnee the information necessary to a determination of such expenses, it is not in a position to make an offer of a specific amount. If the Authority had attempted to offer any amount, that amount could only have been speculative or conjectural. It would be

---

[6] Emphasis supplied.

unreasonable to require the Authority to so "guess" at the amount of such expenses, which would include "Removal Expenses" as provided for in section 608 of the Code, and "Moving Expenses" as provided for in section 610 of the Code. The language of these sections, and the Comment of the drafters as to the meaning and effect of these sections, clearly reveal that without the requested information being submitted by the condemnees, the Authority could not validly make an offer of any specific amount in payment of such expenses.

Section 608 of the Code provides: "Removal Expenses.—The person having legal possession of machinery, equipment or fixtures on the condemned property, not forming part of the realty, including a tenant not entitled to any proceeds of the condemnation, if under the lease the tenant has the right to remove said machinery, equipment or fixtures, shall be entitled, as damages, to the reasonable expenses of the removal, transportation and reinstallation of such machinery, equipment or fixtures. Reasonable expenses under the provisions of this section shall not exceed twenty-five thousand dollars ($25,000) and in no event shall such expenses exceed the market value of the machinery, equipment and fixtures." The Comment of the drafters of the Code with respect to the "Removal Expenses" provided for in section 608 is as follows: " 'Reasonable expenses' of removal are to be considered as not exceeding the market value of the machinery, equipment and fixtures in place and are to be determined in connection with the value of the machinery, equipment and fixtures. If the cost of removal exceeds the value of the machinery, etc., the cost would obviously be unreasonable. In addition, in ascertaining the reasonableness of the removal expenses another factor to be considered is the distance of the move." Therefore, how could the Authority determine the amount of "Removal Expenses" it should offer to pay the condemnees with-

out receiving from them the requested information as to the machinery involved or the distance of the move they intend to make.

As to the amount of "Moving Expenses" section 610 of the Code provides: "Moving Expenses.—The person having legal possession shall be entitled to, as damages, the reasonable moving expenses for personal property other than machinery, equipment or fixtures, not to exceed five hundred dollars ($500), when personal property is moved from a place of residence and not to exceed twenty-five thousand dollars ($25,000) when personal property is moved from a place of business. Receipts therefor shall be prima facie evidence of reasonable moving expenses. A tenant shall be entitled to recover these moving expenses even though he is not entitled to any of the proceeds of the condemnation. In no event shall such expenses exceed the market value of such personal property."

The Comment to that section by the drafters states:

"This section changes existing law by allowing the condemnee to recover as a separate and additional item of damages *his* reasonable expenses for moving his personal property, as distinguished from machinery, equipment and fixtures.

"It is the purpose of this section to permit the recovery by the condemnee of these moving expenses in addition to the expenses for moving machinery, equipment and fixtures as provided in Section 608 of this article. If a tenant is involved and has no right to any of the damages for the property taken, he would still be entitled to these moving expenses. *In ascertaining whether the expenses are reasonable, a factor to be considered is the distance of the move as well as the total amount of the expenses.*"

In this case the condemnee tenant would have the Authority make an offer of a specific amount of the moving expenses when it is not known what, if any, per-

sonal property is required to be moved and the distance of the move. Nor were any receipts offered which, under the provisions of said section 610, would have established a prima facie figure to be offered by the Authority in payment.

It is our opinion, therefore, that the offer contained in the Authority's letter of March 17, 1966 constituted a compliance, sufficient under all the attendant circumstances, with section 407(a) of the Code, supra, requiring "a written offer to pay to the condemnee, the amount of just compensation as estimated by the condemnor. . .". To hold otherwise would be to permit a condemnee to foreclose the condemnor's right to possession by the simple device of not releasing the information upon which a specific figure could be based.

The Clebans also rely on section 611 of the Code which provides that: "The condemnee shall not be entitled to compensation for delay in payment during the period he remains in possession after the condemnation, nor during such period shall a condemnor be entitled to rent or other charges for use and occupancy of the condemned property by the condemnee. . ." But said section 611 was only intended to permit the payment of delay compensation and the payment of rent to offset each other, as noted by the drafters of the Code: "The first sentence of this section is included to make it clear that while the condemnee is in possession of the condemned property, he does not get delay compensation but the condemnor is not entitled to rent or other charges for use and occupancy. The reason for this is that while the condemnee is in possession, the condemnee is not building up damages for delay and the condemnor is not accruing liability for delay damages. Consequently, the delay compensation and the rent, in a sense, offset each other."

In this case, there clearly was no delay compensation due the condemnees. However, the condemnees

contend that since the legislature did provide in the first part of section 611 that the condemnor is not entitled to rent and the condemnee is not entitled to delay compensation where he stays in possession of the premises, and later in that section provides that the condemnee is entitled to delay compensation after relinquishing possession, remaining silent as to the condemnor's right to receive rent at any time, that it follows that the condemnor is never entitled to rent. It would appear to this court, however, that just the opposite reasoning should govern: that since the legislature has stated when the condemnor is not entitled to receive rent (that is, as an offset to delay compensation), that in all other cases the condemnor is entitled to rent where the condemnee remains in possession after condemnor's right to possession accrues and no delay compensation is due condemnee.

We conclude, therefore, that the Authority was entitled to possession under the terms of section 407(a) of the Code, that it was entitled to receive rent from the condemnees after its right to possession accrued, and that its right to rentals was not offset by any liability for delay compensation.

Judgment affirmed.

---

CONCURRING OPINION BY HOFFMAN, J.:

Judge CERCONE has written his usual careful and exhaustive opinion. I agree with him, but I would like to add a few words as to the inapplicability of Section 611.

Section 611 of the Eminent Domain Code provides, in relevant part, as follows: "The condemnee shall not be entitled to compensation for delay in payment during the period he remains in possession after the condemnation, *nor during such period shall a condemnor be entitled to rent* or other charges for use and occu-

pancy of the condemned property by the condemnee." Act of June 22, 1964, P. L. 84, Art. VI, §611, 26 P.S. §1-611 (Supp. 1969) (Emphasis added.) A casual reading of the statute might indicate that all condemnees, owners and tenants alike, need not pay rent while they continue in possession following condemnation. Prior law, against whose background the statute was written, would indicate, however, that this is not the correct reading.

An owner of property condemned for public use has traditionally been held entitled to damages for any delay in paying the amount due as compensation for the taking. See, e.g., *Rednor & Kline, Inc. v. Department of Highways,* 413 Pa. 119, 196 A. 2d 355 (1964); *Hughes v. Commonwealth,* 414 Pa. 606, 202 A. 2d 15 (1964). Even while still in possession of his property, the owner was held entitled to such delay compensation. "Delay of payment is not the less an injury, because the landowner may continue the occupation of the land. Such occupation can be but permissive, at all times subject to the paramount rights of the public. The land cannot be built upon or improved, except at the hazard of the improver, and it is worthless for sale." *City of Philadelphia v. Dyer,* 41 Pa. (5 Wright) 463, 470 (1862). See *City of Philadelphia v. Miskey,* 68 Pa. (18 P.F. Smith) 49, 52 (1871). Cf. *Second Street, Harrisburg,* 66 Pa. (16 P.F. Smith) 132, 133 (1870). Of course, to the extent that the owner was receiving benefit from his continued possession, his delay compensation was reduced. See *Pattison v. Buffalo, Rochester & Pittsburgh Ry. Co.,* 268 Pa. 555, 112 A. 101 (1920); *Hughes v. Commonwealth,* supra at 608-610. Section 611, however, denied any delay compensation during continued possession, whether or not any would have been due under prior law. The statute avoided penalization by prohibiting the condemnor from charging rent at the same time. Compare *Redevelopment*

*Agency v. Norwalk Aluminum Foundry Corp.*, 155 Conn. 397, 233 A. 2d 1 (1967); *Ames v. Wilmington Housing Authority*, 233 A. 2d 453 (Del. Super. 1967).

Appellants' situation, however, is not analogous.

First, appellants, who were tenants on a month-to-month basis, have not shown there has been any compensable taking as to them. See, e.g., *Profit-Sharing Blue Stamp Co. v. Urban Redevelopment Authority*, 429 Pa. 396, 241 A. 2d 116 (1968); *In re Opening of Evergreen Street*, 1 Dauphin 68 (C.P. 1898). While the lease required a rental of $325.00 monthly, both parties agreed that $162.50 was a fair monthly rental. No more was asked by the Authority. The compensable loss suffered by a tenant as a result of a condemnation has always been computed by multiplying the difference between the fair rental value of the property and the actual rent paid by the condemnee by the number of months remaining on his lease. Since there was no such difference and, in fact, the agreed fair rental value was below the actual rental paid, there was no compensable taking.

Moreover, even had there been a taking which was compensable, it would have been for only one month's expected renewal, at most. Appellants, by remaining in possession for that month at $162.50 (or even at $325.00), thus negated even the possibility of compensation.

Since there was no taking which was compensable, appellants could collect no delay compensation for delay in payment. Hence, to charge them rent for their continued possession (while denying delay compensation) would be no penalty upon appellants. The statute, therefore, was not intended to include appellants within its scope of protection.

Accordingly, as Judge CERCONE concluded, Section 611 was inapplicable.