A Condemnation Proceeding In REM by the REDEVELOPMENT AUTHORITY OF The CITY OF PHILADELPHIA for the purpose of Redevelopment of North Philadelphia Redevelopment Area Model Cities Urban Renewal Area Condemnation No. 30 B Philadelphia, PA including certain land improvements and properties.

RE: 1839 North Eight Street.

Appeal of: Mary Smith.

Commonwealth Court of Pennsylvania.

Argued Nov. 16, 2005.
Decided Feb. 6, 2006.

---

Robert J. Sugarman, Philadelphia, for appellant.

Peter A. Galante, Philadelphia, for appellee, Redevelopment Authority of the City of Philadelphia.

BEFORE: COLINS, President Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge SMITH–RIBNER.

The issue in this case is one of first impression for the Court. The question for the Court to decide is whether the Redevelopment Authority of the City of Philadelphia (Authority) may exercise eminent domain power to condemn a private homeowner's property, located in an area of North Philadelphia that was certified as blighted, and then turn over the acquired property to a purely private religious organization to construct and operate a private independent school.

Mary Smith (Condemnee) appeals from the order of the Court of Common Pleas of Philadelphia County that overruled prelim-inary objections filed by Condemnee and her Daughter Veronica Smith to the Authority's November 21, 2003 Declaration of Taking that condemned property owned by Condemnee at 1839 North Eighth Street in the City of Philadelphia (Property). Condemnee asserts that the trial court erred in holding that the existence of blight justified the condemnation regardless of the specific developer's purpose for the intended project, in holding that the Property may be taken and given to a religious organization and in failing to recognize that Condemnee's Daughter shared an ownership interest in the Property and was due relocation costs.

I

In February 2004 the trial court ordered that evidence in the case be taken by deposition and that counsel were to submit the notes of testimony and any supplemental memoranda for the court to consider before reaching its decision. The record establishes that Condemnee owns the Property but currently resides in a nursing home and that her Daughter has resided in the Property for over 50 years and presently resides there with her family. On September 4, 2002, the "Hope Partnership for Education" submitted by letter to the Authority's Director of Urban Renewal Activities, Michael Koonce, specific documents pertaining to the prior request for the Authority to acquire specific land targeted by the Hope Partnership in eastern North Philadelphia. See Reproduced Record (R.R.) at 42a–44a.

The Hope Partnership proposed to build a private independent middle school in a blighted neighborhood, and it described the venture in its project narrative submitted to the Authority as being between "Two Communities of religious sisters, the Society of the Holy Child Jesus and the Sisters of Mercy...." R.R. at 43a. It

further explained that "[t]his collaborative venture is being built on the long established Holy Child and Mercy traditions of service ... [and][a]s vowed religious, we are called to journey with those in need...." *Id.* The private school will operate through foundation, business and private funding. *Id.*

On October 20, 2002, after receiving the City Planning Commission's November 26, 1968 blight certification for the North Philadelphia Redevelopment Area, the Authority prepared its redevelopment proposal titled "The Thirtieth Amended Redevelopment Proposal" for submission to the Planning Commission. *See* Supplemental Reproduced Record (S.R.R.) at 30b, 64b; Ex. 2 at 85b. The proposal's Fact Sheet lists the development projects, which includes the Hope Partnership project identified as the "North Franklin/North 8th Street Landbank (Hope Partnership for Education)." R.R., Ex. A at 25a; S.R.R. at 89b. The area is bounded by North 8th Street to the west, North Franklin Street to the east, Berks Street to the north and Montgomery Avenue to the south. *Id.* The Hope Partnership is one of the entities for which the Authority will make land acquisition through the City's Neighborhood Transformation Initiative; the land will be given to it for a nominal price. R.R., Ex. A at 25a, 68a–69a (Deposition of M. Koonce).

By letter dated October 18, 2002, the Planning Commission approved the proposal, which the Authority then submitted to City Council. S.R.R. at 31b. After a public hearing December 9, 2002, City Council passed Ordinance No. 020681 on December 19 approving acquisition, *inter alia*, of the 39 designated properties for the Hope Partnership project. R.R., Ex. A at 25a; S.R.R. at 32b, 114b. The proposed acquisition cost was $860,250, and the developer was identified as the Hope

Partnership. R.R., Ex. B at 30a. On August 21, 2003, after previously notifying Condemnee that her Property would be appraised, the Authority offered Condemnee $12,000 as estimated just compensation, S.R.R. at 121b; on November 6, 2003, the Hope Partnership wrote Condemnee advising her about plans to acquire the land at 8th and Berks and of the Authority's plan to negotiate relocation; and on November 21, 2003, the Authority initiated the taking.

Condemnee filed preliminary objections on December 23, 2003. She averred, among other things, that her Daughter owns an equitable interest in the Property and is the prime tenant residing there, that the Authority's taking was not for a public purpose, that the taking is arbitrary and capricious and is discriminatory, that the taking is the result of a predetermined illegal commitment to a private entity, that Condemnee's due process rights were violated and that the taking was made without due compensation to Condemnee's Daughter because the Authority refused to recognize her ownership interest.

The trial court overruled the preliminary objections based upon its ultimate conclusion that "[o]nce the land was certified as blighted, it is proper to then transfer the land to private development, regardless of 'who' that future developer may be." Slip op. at 3. Relying upon *Belovsky v. Redevelopment Authority of Philadelphia*, 357 Pa. 329, 54 A.2d 277 (1947), the trial court determined that the elimination of blighted areas constitutes a proper public purpose for which the Authority may use its power of eminent domain. *See* Section 2(d) of the Urban Redevelopment Law, Act of May 24, 1945, P.L. 991, *as amended*, 35 P.S. § 1702(d). It noted that Condemnee did not challenge the certification of blight, which occurred some 35 years before the condemnation,

and it quoted the propositions from *Belovsky* that a taking does not lose its public character simply because some future private gain may result and that if the public good is enhanced it is irrelevant that a private interest may benefit from the taking. The court flatly rejected the argument that the taking implicates an impermissible entanglement of church and state. It stated only that the taking was due to sub-standard and blighted conditions of the Property and that the taking was authorized by Sections 9 and 12 of the Urban Redevelopment Law, 35 P.S. §§ 1709 and 1712.

The trial court concluded that because no deed exists to pass title from Condemnee to the Daughter, she possesses only a tenancy at will and may be regarded as a displaced person entitled to specific damages. Relying on Section 201(8)(i)(A)(I) of the Eminent Domain Code, Act of June 22, 1964, Special Sess., P.L. 84, *as amended*, 26 P.S. § 1–201(8)(i)(A)(I), and *Urban Redevelopment Authority of Pittsburgh v. Cleban*, 216 Pa.Super. 269, 264 A.2d 187 (1970), the court offered that the Daughter may be entitled to certain damages when she relocates and submits documentation for the Authority to determine relocation costs due.

## II

### A

■ The Court's review of a trial court's decision to sustain or to overrule preliminary objections to a Declaration of Taking in an eminent domain case is limited to determining whether the trial court abused its discretion or whether it committed an error of law. *In re Condemnation of Land in Robinson*, 861 A.2d 387 (Pa. Cmwlth.2004). When reviewing condemnation cases under the Urban Redevelop-

ment Law, the Court must ascertain that the redevelopment authority has not acted in bad faith or acted arbitrarily, that it has followed required statutory procedures in preparing a redevelopment plan and that there were no constitutional violations. *See In re Condemnation of 110 Washington Street*, 767 A.2d 1154 (Pa.Cmwlth. 2001). In addition, in *Redevelopment Authority of Erie v. Owners or Parties in Interest*, 1 Pa.Cmwlth. 378, 274 A.2d 244 (1971), this Court acknowledged its limitations on appellate review of a trial court decision to sustain or to overrule preliminary objections. It stated that "[w]ith respect to inferences and deductions from facts and conclusions of law, both the court en banc and the appellate courts have the power to draw their own inferences and make their own deductions and conclusions." *Id.*, 274 A.2d at 253 (citing *Felt v. Hope*, 416 Pa. 118, 206 A.2d 621 (1964); *Kalyvas v. Kalyvas*, 371 Pa. 371, 89 A.2d 819 (1952)).

■ Preliminary objections filed pursuant to Section 406(a) of the Eminent Domain Code, 26 P.S. § 1–406(a), serve a different function than those filed in other civil actions. *In re Stormwater Mgmt. Easements*, 829 A.2d 1235 (Pa.Cmwlth. 2003). They are the exclusive method for resolving challenges to the power or right of the condemnor to appropriate the condemned property unless previously adjudicated, the sufficiency of the security, any other procedures followed by the condemnor or the declaration of taking. *Id.* They are intended to serve as a mechanism for the expeditious resolution of factual and legal challenges to a Declaration of Taking before the parties proceed to the damages stage. *Id.*

### B

Condemnee initially contends that the trial court's interpretation of *Belovsky* is

inaccurate and that this Court expressly held in *Redevelopment Authority of Erie* that a property may be acquired only to the extent reasonably required for a public purpose. The Authority acquired the Property to convey it to the Hope Partnership to construct a private religious school, which, according to Condemnee, is an impermissible use of eminent domain power. Furthermore, the elimination of a substandard structure in a blighted area is an insufficient reason for condemning property where the owner has been denied the right to repair and rehabilitate. Specifically, Condemnee claims that the Authority's condemnation violates the Establishment Clause of the First Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment. She also claims violation of Article I, Section 3 of the Pennsylvania Constitution, which provides that "no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry without his consent. . . ."

In her reply brief, Condemnee discusses *Kelo v. City of New London,* —— U.S. ——, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), which was decided after Condemnee filed her main brief. She asserts that the reasoning there reinforces her position. The *Kelo* Court emphasized that a property may not be taken under the pretext of a public purpose when the actual purpose is to bestow private benefits and that a taking is less likely to be pretextual when the ultimate owner of the property is not known when a taking occurs. Condemnee asserts that the ultimate beneficiary was known prior to the condemnation here, which creates an inference that it was for the improper purpose of providing a gift. Unlike the comprehensive economic development purpose upheld in *Kelo,* the purpose here was to dispose of land to a religious organization to construct and operate a private school.[1]

In response, the Authority maintains that the trial court neither abused its discretion nor committed an error of law when it overruled the preliminary objections based upon *Belovsky.* The Authority submits that cases relied on by Condemnee are distinguishable and do not support her claim that the principle announced in *Belovsky* has been modified in any way. The Authority stresses that it strictly complied with all provisions of the Urban Redevelopment Law and that, unlike the situation in *Redevelopment Authority of Erie,* there is no allegation or showing by Condemnee of the Authority's bad faith. Also because the Property is located in a blighted area, the soundness of its structure is an insufficient basis for preventing condemnation. *See, e.g., Craw-*

---

1. Condemnee contends that in determining just compensation, "the owner" of property should be broadly construed and that the Authority is required to provide replacement costs as just compensation to the Daughter. Section 602–A(a) of the Eminent Domain Code, added by Section 8 of the Act of December 29, 1971, P.L. 642, 26 P.S. § 1–602A(a), provides that in addition to payments otherwise authorized, the acquiring agency must make an additional payment, not exceeding $22,500, to any displaced person and that such amount, when added to the acquisition cost of the acquired dwelling, equals the reasonable cost of a comparable replacement dwelling available to the displaced person in the private market.

The Authority counters that a just compensation challenge must be made when the Authority seeks possession of the Property under Section 407, 26 P.S. § 1–407. In addition, under Section 201(2), 26 P.S. § 1–201(2), a condemnee is "the owner of a property interest taken. . . ." Because the Daughter is not the owner of the Property she is not a condemnee. Nonetheless, the question of whether replacement housing costs are due should be resolved by the board of viewers at the appropriate time. The Court need not address this issue in light of its disposition.

*ford v. Redevelopment Authority of Fay-ette,* 418 Pa. 549, 211 A.2d 866 (1965).

The Authority posits that the public purpose of its condemnation was established once the area was certified as blighted, which eliminated the need for consideration of the status or nature of the potential developer of the land. It disputes the contention that it exercised eminent domain power to make a religious gift and notes that, although Hope Partnership schools assume the presence of God, the schools are non-sectarian and accept students without regard to race, creed, color, religion or ethnicity. Also none of the cases that Condemnee cited to support a violation of the Establishment Clause involved eminent domain power or urban redevelopment law.

■ Moreover, when a determination of blight is made the Authority has power to propose remedies, and the exercise of eminent domain power is one of the tools at its disposal to implement a redevelopment proposal. *See In re Condemnation by Urban Redevelopment,* 823 A.2d 1086 (Pa. Cmwlth.2003), *appeal granted,* 577 Pa. 703, 847 A.2d 59 (2004). Also any contract entered into between the Authority and the Hope Partnership would be subject to City Council's approval under Section 10(j) of the Urban Redevelopment Law, 35 P.S. § 1710(j), and any contract must conform to the requirements of Section 11, 35 P.S. § 1711.

### III

From its examination of the record and the application of basic and fundamental principles of law, the Court concludes that the trial court did indeed commit an error of law when it overruled the preliminary objections. The trial court erred on several fronts. First, it erred in holding that when land is certified as blighted the Authority may transfer it to private develop-ment no matter "who" the future developer may be. Second, the court evidently presumed, improperly, that Condemnee's failure to challenge the certification of blight effected a waiver of her challenge to the taking. Third, the court erred in rejecting Condemnee's claim that the taking implicated an impermissible entanglement of church and state. Finally, it erred in concluding that simply because the property was substandard and in blighted condition the Authority was authorized to take it.

### A

To provide a procedural framework for the scheme of redevelopment under the Urban Redevelopment Law, the Supreme Court stated in *Belovsky:*

The local planning commission makes a "redevelopment area plan" designating an area which it finds to be blighted because of the existence of the conditions enumerated in the act and containing recommendations for the redevelopment of such area. The plan must set forth the boundaries of the area, information concerning its buildings and population, a statement of the existing uses of the real property therein, a statement of the proposed uses following redevelopment, a statement of the proposed changes in zoning ordinances and street layouts, an estimate of the cost of acquisition of the area and other costs necessary to prepare it for redevelopment, and a statement of such continuing controls as may be deemed necessary to accomplish the purposes of the act. Thereupon the Authority prepares a "redevelopment proposal" for the redevelopment of all or part of such area, including the proposed redevelopment contract and the selection of the redeveloper, and submits this proposal to the planning commission for review. The

proposal, together with the planning commission's recommendations thereon, are then certified to the governing body, which, after a public hearing, approves or rejects the proposal and the redevelopment contract; in the event of the proposal being approved the Authority is empowered to execute the contract and to take such action as may be necessary to carry it out. The contract provides for the amount of the consideration to be paid by the redeveloper to the Authority and for the necessary continuing controls.

*Id.,* 357 Pa. at 335–336, 54 A.2d at 280–281. The Supreme Court acknowledged that an owner of property has the right to the uninterrupted use and enjoyment of her property, subject to the right of the state to take such property as necessary to serve public uses. It appears that the general redevelopment scheme was followed here, although as discussed below any reliance upon Condemnee's failure to challenge the 1968 blight certification is flawed and cannot legally support any implication that she somehow waived her objections to the taking.

### B

■ At the outset, Condemnee correctly recites the well-settled principles that the authority to exercise eminent domain power must be strictly construed and that a certification of blight does not in and of itself authorize the condemnation of property, citing to *Winger v. Aires,* 371 Pa. 242, 89 A.2d 521 (1952), and *Redevelopment Authority of Scranton v. Kameroski,* 151 Pa.Cmwlth. 345, 616 A.2d 1102 (1992). In addition, a redevelopment authority does not have power to acquire one man's land by condemnation to satisfy another man's need, *Redevelopment Authority of Erie. See also Condemnation of 110 Washington Street* (noting that the exercise of eminent domain power is in derogation of a private

citizen's right to hold property and that the authority to condemn must be strictly construed).

In *In re Forrester,* 575 Pa. 365, 836 A.2d 102 (2003), the Supreme Court acknowledged the well-settled principle that the state exercises its eminent domain powers when it takes property for a public use. *See Balent v. City of Wilkes–Barre,* 542 Pa. 555, 669 A.2d 309 (1995). Quoting *Belovsky,* 357 Pa. at 341, 54 A.2d at 283, the Supreme Court recognized that a taking does not "lose its public character merely because there may exist in the operation some feature of private gain, for if the public good is enhanced it is immaterial that a private interest may also be benefited." *In re Forrester,* 575 Pa. at 370, 836 A.2d at 105. The court observed, nonetheless, that a taking will have a public purpose only when the public is to be the primary and paramount beneficiary of the exercise of eminent domain power and that to consider a taking as effectuating a public purpose the citizenry at large rather than a private entity or individual will be the principal recipient of any benefit.

In *Redevelopment Authority of Erie* this Court recognized the cogent observations made in *Philadelphia Clay Co. v. York Clay Co.,* 241 Pa. 305, 309–310, 88 A. 487, 488 (1913):

> While the power of the Legislature to invest individuals or corporations with the right to take private property for a public use is clearly recognized by the Constitution, there is not a suggestion anywhere that private property may be taken for a private use. It has been uniformly held by the courts in our own state as well as in other jurisdictions that under the right of eminent domain private property can only be taken for a public use.... The underlying principle is that the owner of property has the

right to the uninterrupted use and enjoyment of it against all the world, subject, however, to the sovereign right of the state to take so much of it as may be necessary to serve the various public uses to which it may be properly subjected.

This Court clarified in *Redevelopment Authority of Erie* that the above reasoning was still valid and that it in no way had been altered by *Belovsky*. In short, nothing in the Constitution authorizes a taking of private property for a private use.

## C

■ Section 2(a) of the Urban Redevelopment Law, 35 P.S. § 1702(a), authorizes the designation of an area as blighted because its dwellings are unsafe, unsanitary, inadequate or overcrowded. There is no dispute in the present case that the area in which the Property sits was certified as blighted by the Planning Commission in November 1968. Likewise, there is no dispute that Condemnee did not challenge the certification of blight, which occurred some 35 years prior to the taking. To suggest that she may have waived her present challenge by failing to contest the blight certification is patently erroneous as shown by the decision in *Redevelopment Authority of Scranton*. This Court upheld the trial court's decision that the certification of blight there did not affect the condemnees' property rights but merely set the stage for redevelopment, citing *Matter of Urban Redevelopment Authority of Pittsburgh*, 527 Pa. 550, 594 A.2d 1375 (1991), and noted that while the Urban Redevelopment Law allows a taking to implement or effectuate a redevelopment plan it must be specific enough to notify potential condemnees of their future.

■ Following the decision in *Matter of Urban Redevelopment Authority of Pitts-*

*burgh*, the Court held in *Redevelopment Authority of Scranton:*

> A certification of blight does not in and of itself give a condemnor, such as [Scranton Redevelopment Authority], the authority to condemn all property within the area. Under the URL, a certification of blight is merely an internal finding that certain physical conditions exist in the project area that make the area "blighted." The certification itself does not affect property rights but only sets the stage for redevelopment.

*Id.,* 616 A.2d at 1104. The Court rejected the argument that the condemnees' failure there to challenge the certification of blight effectuated a waiver of their right to challenge the subsequent taking. That holding applies with equal force to the present case. There is absolutely no merit to the contention, or suggestion, that Condemnee somehow waived her right to challenge the Authority's Declaration of Taking because she failed to challenge the Planning Commission's blight certification for her North Philadelphia area. Nor does the law support the trial court's determination that once land is certified as blighted, it is irrelevant "who" the private developer may be. It is evident that the Authority may not use public funds to acquire land for a religious organization for its construction and operation of a private school.

## D

The Establishment Clause requirements were carefully examined by the United States Court of Appeals for the Third Circuit in *Gilfillan v. City of Philadelphia*, 637 F.2d 924 (3d Cir.1980). The Court of Appeals set forth the three-part test that must be applied when determining whether a violation of the Establishment Clause has occurred. In deciding that a violation

occurred in that case, the court explained the following:

The first amendment of the Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." The amendment was made binding on the states by the fourteenth amendment. *Everson v. Board of Education,* 330 U.S. 1, 8, 67 S.Ct. 504, 507, 91 L.Ed. 711[, 719] (1947). The two religion clauses have stirred deep feelings and their meaning has been much litigated. Although members of the Supreme Court have disagreed on the proper application of the Establishment Clause, a fairly simple statement of the test has evolved: "(A) legislative enactment does not contravene the Establishment Clause if it has a secular legislative purpose, if its principal or primary effect neither advances nor inhibits religion, and if it does not foster an excessive government entanglement with religion." *Committee for Public Education v. Regan,* 444 U.S. 646, 653, 100 S.Ct. 840, 846, 63 L.Ed.2d 94[, 102] (1980), citing *Roemer v. Maryland Public Works Board,* 426 U.S. 736, 748, 96 S.Ct. 2337, 2345, 49 L.Ed.2d 179[, 188] (1976); *Committee for Public Education v. Nyquist,* 413 U.S. 756, 772–73, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948[, 962–963] (1973); *Lemon v. Kurtzman,* 403 U.S. 602, 612–613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745[, 755] (1971). This circuit is familiar with the application of this three-part test.

*Gilfillan,* 637 F.2d at 928–929 (citations omitted).[2]

The Court of Appeals applied the three-part test to the evidence presented in *Gilfillan,* where the court was confronted with the issue of whether the City of Philadelphia violated the Establishment Clause when it paid more than $200,000 to construct a special platform and provide other extraordinary assistance for a Holy Mass that was conducted by Pope John Paul II at Logan Circle. The Court of Appeals agreed with the District Court, as to the first prong, that the construction of the special platform had merely an incidental secular purpose; instead, the primary purpose of the City's action was religious, *i.e.,* celebration of Holy Mass by the Pope assisted by Bishops of the Catholic Church. As to the second prong, the Court of Appeals again agreed with the District Court that the City's actions had a primary religious effect in that they aided the Pope's mission by providing the construction and enabled the Pope to celebrate Mass and to deliver a religious message. The religious effect was plain and primary and could only be considered as advancing religion. As to the third prong, *i.e.,* entanglement, the Court of Appeals agreed that the joint event planning between the Archdiocese and the City revealed its entanglement with religion. The District Court made the alternative finding that this assistance tended to promote divisiveness among and between religious groups. Because the City did not meet the test, the Court of Appeals held that it violated the Establishment Clause and that the Archdiocese had to reimburse the funds unconstitutionally spent to support the Holy Mass.

█ The application of the three-part test to the evidence here shows unequivo-

---

**2.** *See also Springfield School District v. Department of Education,* 483 Pa. 539, 397 A.2d 1154 (1979) (applying three-part test to determine whether statute requiring school transportation for nonpublic and public school students within a district and within ten miles outside of district boundaries violated Establishment Clause and stating that to pass constitutional muster all three requirements of the test must be satisfied before the statute may be allowed to stand).

cally that the Authority's taking contravened the Establishment Clause. First, the Authority's primary purpose was to acquire land for the Hope Partnership to make it available for construction and operation of a private school. Although the Authority argued that no contract is yet executed between the Authority and the Hope Partnership, such evidence is immaterial where the redevelopment proposal included the religious organization as the developer, the Planning Commission approved the proposal, City Council enacted the required ordinance and the Authority then proceeded with its taking. Second, the Authority's land acquisition for the Hope Partnership had a primary religious effect because it directly aided the religious organization's mission to provide faith-based educational services, among other things, to residents in the blighted area. *See* S.R.R. at 125b. The land acquisition had the primary effect of advancing religion. Third, there is no dispute that the Authority jointly worked with the Hope Partnership in effectuating the taking. The evidence shows that the Hope Partnership designated the land that it wanted and requested the Authority to acquire it, and the Authority proceeded to do so. This joint effort demonstrates the entanglement between church and state.

In *Haller v. Commonwealth, Department of Revenue*, 556 Pa. 289, 728 A.2d 351 (1999), the Pennsylvania Supreme Court upheld this Court's ruling that a Pennsylvania sales tax exemption for the "sale at retail or use of religious publications sold by religious groups and Bibles and religious articles" was unconstitutional as it violated the Establishment Clause. This Court had determined that the tax exemption failed to serve a secular purpose and thus did not pass the constitutional bar of the Establishment Clause, relying heavily upon the reasoning and holding in *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989). The Supreme Court reviewed case law analyses of the Establishment Clause beginning with *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and it concluded that under *Texas Monthly* it is critical that any subsidy granted religious organizations be warranted by some overarching secular purpose that justifies like benefits for nonreligious groups. The Supreme Court reasoned as follows:

> Comparable to the deficient Texas exemption, Pennsylvania's exemption does not extend to publications by nonreligious groups, which are taxed, and therefore also lacks the requisite breadth for this to be anything but legislation intended solely to provide tax relief to religious organizations. Lacking a broader secular purpose, this exemption cannot survive an Establishment Clause challenge pursuant to the United States Supreme Court's holding in *Texas Monthly*.

*Haller*, 556 Pa. at 299, 728 A.2d at 356. The decision in *Haller* provides added persuasive authority for the conclusion reached here that the Authority's taking constitutes a violation of the Establishment Clause.[3]

---

**3.** Although the trial court did not consider the allegations of favoritism or improper purpose, Condemnee nonetheless asserts that the issue of the impermissible purpose for the taking is squarely before the Court based on the Authority's designation of the Hope Partnership as the intended beneficiary of the land acquisition prior to the condemnation and that such designation represents an independent basis for quashing the condemnation in addition to the Authority's violation of the Establishment Clause. Condemnee points out that the majority and concurring opinions in *Kelo* emphasize that property may not be taken under the pretext of performing a public purpose when the actual purpose is to bestow a

In conclusion, the Court holds that the trial court committed an error of law in overruling Condemnee's preliminary objections. The law does not permit the Authority to take private property and then turn it over to a religious organization for its private development purposes; the law does not require Condemnee to challenge the blight certification before she may contest the taking; settled law precludes the Authority from taking private property in violation of the Establishment Clause; and, in the alternative, the law does not support a conclusion that the taking here was for a public use. The order of the trial court is therefore reversed.

### ORDER

AND NOW, this 6th day of February, 2006, the order of the Court of Common Pleas of Philadelphia County overruling the preliminary objections filed by Mary Smith, Condemnee, is hereby reversed.

PELLEGRINI, J., dissents and files opinion in which LEADBETTER and LEAVITT, JJ., join.

private benefit to another and that a taking is less likely to be pretextual when the ultimate owner or developer of condemned property is unknown at taking.

Although the reversal here is premised on the Authority's violation of the Establishment Clause, the Court cannot ignore that in *Kelo* the court's decision was based on its agreement that the comprehensive economic development plan there served a public purpose and thereby satisfied the public use requirement of the Fifth Amendment—the plan was designed to benefit the entire City of New London. In stark contrast, the taking here resulted from a plan to acquire land with public funds for the benefit of a religious organization to build a private school; hence, it cannot satisfy the public use requirement. Of particular note is the court's observation in *Kelo* that in affirming the taking, its decision

### DISSENTING OPINION BY Judge PELLEGRINI.

I respectfully dissent from the majority decision because the Redevelopment Authority of the City of Philadelphia (Authority) may exercise eminent domain power to condemn a private homeowner's property when the property is located in a blighted neighborhood, and the property owner/condemnee in this case, Mary Smith (Smith), failed to prove that the Authority was condemning property that was not blighted.

This case involves the condemnation of property owned by Smith located at 1839 North Eight Street in which her daughter, Veronica Smith, resided. The neighborhood was certified as blighted by the City of Philadelphia's Planning Commission in 1968.[1]

In September 2002, the "Hope Partnership for Education" (Hope Partnership) renewed its initial request to the Authority to acquire land in eastern North Philadelphia for the purpose of building a private independent middle school with after-school programs and an adult education center in a blighted neighborhood. In its Vision Statement, Hope Partnership indi-

did not preclude states from placing further restrictions on the exercise of eminent domain power and that many states already imposed a "public use" requirement that is more stringent than the federal standard, some of which have been established as a matter of state constitutional law. Also other requirements are set forth in state eminent domain statutes that restrict the grounds upon which takings may be exercised. The court indicated that a one-to-one transfer of property executed outside the context of an integrated development plan was not presented in *Kelo*.

1. Section 2(a) of the Urban Redevelopment Law, Act of May 24, 1945, P.L. 991, *as amended*, 35 P.S. § 1702, authorizes that an area may be designated as blighted when its dwellings are unsafe, unsanitary, inadequate or overcrowded.

cated that the project was a collaborative venture in the religious "tradition of service,"[2] but that the middle school, after-school programs and the adult education center were intended to serve "a variety of religious backgrounds and beliefs." The Authority presented a redevelopment proposal to the City of Philadelphia's Planning Commission (Commission) which included Smith's property, as well as 38 other properties, which the Authority would purchase for a nominal amount through the City's Neighborhood Transformation Initiative[3] for use by Hope Partnership.[4] Nonetheless, the Commission approved the proposal and submitted it to City Council for approval. On December 9, 2002, City Council passed Ordinance No. 020681 ap-

proving the purchase and development of the 39 properties. However, at the present time, no agreement has been entered into between the Authority and the Hope Partnership that binds the Partnership to anything and can walk away from the project.

The Authority notified Smith that it was condemning her property and offered her $12,000 as compensation and aid in relocating. After the taking was initiated, Smith filed preliminary objections alleging, *inter alia*, that the Authority's taking of her property was not for a public purpose but instead for a religious purpose in violation of the Urban Redevelopment Law and the Establishment Clause of the United States Constitution,[5] and that her due process

---

**2.** The project was described as follows:

> In January 2001, Sisters of the Holy Child, Brothers of the Christian Schools and Sisters of Mercy gathered to initiate the ongoing process of creating an intergenerational, independent educational center in an economically depressed and educationally underserved area of North Philadelphia. This collaborative venture is being built on the long established Holy Child, Lasallian and Mercy tradition of service, characterized by reverence, compassion and belief in the life-changing power of education. As vowed religious, we are called to journey with those in need, respecting and serving a variety of religious backgrounds and beliefs. (Reproduced Record at 42a.) Hope Partnership also desired to develop 38 other properties for development.

**3.** The Neighborhood Transformations Initiative is described in the proposal as "a strategy to rebuild Philadelphia's neighborhoods as thriving communities with clean and secure streets, recreational and cultural outlets, and quality housing. Among the central goals of NTI are to eradicate blight caused by dangerous buildings, debris-filled lots, abandoned cars, litter and graffiti, and to promote redevelopment through large-scale land assembly." (Reproduced Record at 87b.)

**4.** The Commission's proposal not only included projects to be developed by Hope Partnership, but also included projects for develop-

ment by 14 other groups: the Cecil B. Moore Homeownership Zone (55 parcels to be used to build affordable housing for first-time homebuyers); Board of City Trusts (five vacant structures to be used to build affordable housing for first-time homebuyers); The Clifford (existing historic structures to be renovated into 67 units of housing for the elderly); Habitat for Humanity (eight vacant lots and one vacant structure to be used to build housing for single-families and low and moderate income families); Homestart Project (14 vacant structures); Susquehanna Seniors (23 parcels to build affordable housing for seniors and families of median income); EZ/PHS Greening (25 parcels for "clean and green" use); Seedy Acres (existing site to be used to save green space for future community use); 5th District Rehabs (seven vacant structures); Encapsulated Properties (five vacant structures); Women's Christian Revitalization Program (seeks to utilize tax credits for new construction for low income families); Komplete Welding (one vacant parcel to expand existing business); Phoenix Development (two vacant structures to be acquired for creating living space for persons or families living with HIV or AIDS); and Project H.O.M.E. (five vacant structures to be developed into housing for low/moderate income first-time homebuyers).

**5.** The Establishment Clause of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. 1.

rights were being violated.

The trial court overruled the preliminary objections after determining that Smith's property was located in a blighted area and because "[t]he Property was not taken, however, in order to provide land for the developer; rather the entire area was blighted and the redevelopment plan included the turnover of the Property to a private developer, a scenario the Pennsylvania Supreme court found has a proper public purpose." (Trial court's February 23, 2005 decision at 2.) It specifically addressed Smith's argument that the taking was impermissible because there were issues of church and state due to Hope Partnership's religious affiliation as the developer, finding that the property was taken by eminent domain due to substandard, blighted conditions, and that was all that was relevant. The trial court noted that Smith had failed to challenge the certification of blight.

On appeal to this Court, the majority reverses the trial court and grants Smith's preliminary objections because it disagrees that 1) Smith's failure to challenge the certification of the blight constituted a waiver of her challenge to the taking, and 2) once property is certified as blighted, it may be transferred to a private developer regardless of who the developer is. The majority also disagrees that there was no "entanglement of church and state." I dissent because Smith was required to prove that her condemned property was not in a blighted neighborhood, not whether the project might be religious in nature, and failed to do so.

When an authority determines that a neighborhood or a particular parcel of property is blighted, it does so based on studies conducted of the area/parcel demonstrating that "certain physical conditions exist as defined by the Urban Redevelopment Law in the project area that make

the area deemed to be blighted." *In re Condemnation of Lands Situate and Being in the City of Scranton,* 132 Pa. Cmwlth. 175, 572 A.2d 250, 253 (1990), *petition for allowance of appeal denied,* 527 Pa. 131, 589 A.2d 204 (1991). "When the proposed Plan, as prepared by the Redevelopment Authority, is ultimately presented to the governing body, the governing body is free to reject the Plan on any ground, including a belief that conditions in the Project Area do not warrant the redevelopment of the area. 35 P.S. § 1710(h). Unless the governing body approves the Plan, the Planning Commission's certification of blight and the Redevelopment Authority's approval of the Plan are merely beginning and middle to a process that will have no end." *Id.* Throughout this process, the condemnee is not entitled to notice and a hearing because the certification of blight by the Authority is not an adjudication. *Id.* However, the condemnee may attack the certification by filing preliminary objections to the declaration of taking and proving that the neighborhood is not blighted. *Id.*

In this case, Smith is not challenging the Authority's certification of blight in her neighborhood or as it pertains to her property. The Authority is authorized to take the property regardless of whether it has a developer for the property, now or in the future, because the purpose of a taking is to eliminate blight in an area. In *City of Scranton,* citing *Belovsky v. Redevelopment Authority,* 357 Pa. 329, 54 A.2d 277 (1947), we stated:

> The [public] purpose, ... is directed solely to the clearance, reconstruction and rehabilitation of the blighted area, and after that is accomplished, the public purpose is completely realized....

*City of Scranton,* 572 A.2d at 254. Because the area is blighted, the Authority may acquire the property so that the area

may be redeveloped. Because there is no dispute that the area is blighted and that is the "public purpose" for the taking of the property and there is no redevelopment contract in place, those facts should have ended the matter. Even assuming that there was a contract in existence and it violated the Establishment Clause, that does not justify setting aside the condemnation. An Establishment Clause violation would only render the contract unenforceable. Elimination of blight is still a valid purpose even if the land lies fallow until it is conveyed to another developer.

Even if we were forced to address squarely the church-state issue here, I do not see any violation of the Establishment Clause of the First Amendment. First, it is well-settled that after the property is acquired and the blight is eliminated, that property can be conveyed to a private developer. *Belovsky; City of Scranton.* What the majority is suggesting is that the Authority or, for that matter, any governmental entity could not convey property that it has in its possession for a church, school, nursing home, a college run by a religious group or a shelter run by the Salvation Army because that would aid religion and violate the Establishment Clause. To the contrary, what that outcome suggests is "viewpoint discrimination" against religious groups, which is an impingement on their First Amendment rights that has been condemned by the United States Supreme Court in *Good News Club v. Milford Central School,* 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001).

Second, based on what has been pled about the project, there is no possible Establishment Clause violation because there is no proof that the project is a religious enterprise, but only that it is being run by groups who have religious motivations to educate the poor. Holy Child, Brothers of the Christian Schools and Sisters of Mercy, the religious orders that are sponsoring the project, state in their Vision Statement that the project is for the purpose of "creating an intergenerational, independent educational center in an economically depressed and educationally underserved area of North Philadelphia," with the intent to serve "a variety of religious backgrounds and beliefs." Because Holy Partnership has not yet shown that its intentions are otherwise, until such time we must take it at its word and give it the opportunity to provide the middle school, after-school programs and adult center for students from a variety of religious backgrounds and beliefs. *See Central Dauphin School District v. Founding Coalition of the Infinity Charter School,* 847 A.2d 195, 200 (Pa. Cmwlth.), *petition for allowance of appeal denied,* 580 Pa. 707, 860 A.2d 491 (2004) (held that application for proposed charter school for mentally gifted students properly granted because no violation of Charter School Law in that charter school did not discriminate in admissions on basis of intellectual ability and "no evidence of record that ICS would practice discrimination in its enrollment practices.")

Even assuming that the Establishment Clause issue is before us, because there is not one scintilla of evidence that the purpose of this project is to establish a religion but to serve individuals who live in an economically depressed area, that allegation alone does not even come close to implicating the Establishment Clause.

For these reasons, I respectfully dissent.

Judges LEADBETTER and LEAVITT join in this dissenting opinion.